# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　　v.

KURT WILLIAM HAVELOCK,
　　　　　*Defendant-Appellant.*

No. 08-10472

D.C. No.
2:08-cr-00116-
ROS-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, Chief District Judge, Presiding

Argued and Submitted
June 21, 2011—Pasadena, California

Filed January 6, 2012

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Betty B. Fletcher, Stephen Reinhardt,
Kim McLane Wardlaw, Raymond C. Fisher,
Marsha S. Berzon, Johnnie B. Rawlinson,
Consuelo M. Callahan, Sandra S. Ikuta, and N. Randy Smith,
Circuit Judges.

Opinion by Judge B. Fletcher;
Concurrence by Judge N.R. Smith;
Partial Concurrence and Partial Dissent by Judge Reinhardt;
Partial Concurrence and Partial Dissent by Judge Wardlaw;
Dissent by Judge Fisher

---

## COUNSEL

Daniel L. Kaplan, Assistant Federal Public Defender, Phoenix, Arizona, for the appellant.

Michael Thomas Morrissey, Assistant United States Attorney, Phoenix, Arizona, for the appellee.

---

## OPINION

FLETCHER, B., delivered the opinion of the court, which is joined in full by Chief Judge KOZINSKI, Judge BERZON, Judge CALLAHAN, and Judge IKUTA. Parts I, II.A. and II.C. are joined by Judge SCHROEDER and Judge REINHARDT. Parts I, IIA. and II.B. are joined by Judge WARDLAW. Parts I and II.B. are joined by Judge FISHER and Judge N. R. SMITH. Chief Judge KOZINSKI and Judges SCHROEDER, B. FLETCHER, REINHARDT, WARDLAW, BERZON, CALLAHAN, IKUTA, and N. R. SMITH join in the result:

"In matters of statutory construction . . . it makes a great deal of difference whether you start with an answer or with a problem." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 529 (1947). We start with the problem presented by this case: the meaning of "person" and of "addressed to" in 18 U.S.C. § 876(c) ("§ 876(c)"), which prohibits the mailing of communications "addressed to any other person and containing any threat to kidnap any per-

son or any threat to injure the person of the addressee or of another." The answer, we hold, is that § 876(c) refers exclusively to an individual, or to a natural, person. Therefore, the statute requires that the threatening communications be addressed to a natural person. We also hold that in order to identify the addressee, a court is not limited to the directions for delivery on the outside of the envelope or on the packaging, but also may look to the content of the communication. Because appellant Kurt William Havelock's ("Havelock") communications were not addressed to natural persons, we reverse his six convictions of mailing threatening communications in violation of § 876(c).

# I

## A

Five days before Super Bowl XLII,[1] Havelock traveled to the Scottsdale Gun Club and purchased an AR-15 assault rifle, five extra magazines, and ammunition to spare. Evening found Havelock seated at his home computer, studying a map of the parking lots surrounding the University of Phoenix Stadium in Glendale, Arizona, site of the upcoming game.

On "Super Bowl Sunday," approximately half an hour before the opening kickoff, Havelock loaded his newly-purchased assault rifle and several clips of ammunition into his car and drove to a post office near the stadium. There, he deposited six Priority Mail envelopes, two greeting cards, and three "goodbye" letters into a mailbox. In one of the letters, to his former employer, Havelock foresaw: "By the time this letter reaches you, I will probably be deceased or no longer able to sign any further needed paperwork."

Four of the Priority Mail envelopes were addressed to media outlets, specifically, the New York Times, the Los

---

[1]Super Bowl XLII took place on February 3, 2008.

Angeles Times, the Phoenix New Times, and the Associated Press. The remaining two envelopes were addressed to two music-related websites, theshizz.org and azpunk.com. Each envelope contained a "media packet," as Havelock called it, consisting of a six-page "econo-political" manifesto entitled "Karma Leveller: Bad Thoughts on a Beautiful Day" (the "Manifesto"); a brief account of a recent incident involving faux pipe bombs that Havelock discarded; an apologetic letter addressed to the police, directing them to his car, "which [would be] parked in Glendale somewhere around the stadium," and asking them to "not take [out their] hatred for [him] on [his] dogs," and at the end of which Havelock handwrote "DO NOT RESUSCITATE," and another letter comprised of self-described "random blatherings" that was addressed to theshizz.org and azpunk.com, and which described Havelock's tribulations as the owner of a nightclub in the City of Tempe.

Havelock's Manifesto was, in equal parts, a fractured meditation on the purported evils of American society and a past-tense account of the experiences, beliefs, and convictions that set off his anticipated "econopolitical confrontation." Punctuating the Manifesto were references to the Founding Fathers (Benjamin Franklin, Thomas Jefferson), cultural icons (John Rambo, Mad Max, Bugs Bunny), musical groups (Pink Floyd, AC/DC, Bad Religion), video games (Donkey Kong, Grand Theft Auto, State of Emergency), literature (*Alice in Wonderland*, *The Catcher in the Rye)*, and motion pictures (*Road Warrior*, *Hostel*, *The Astronaut Farmer*). Quotations abounded as well, drawn from such diverse sources as the Hebrew Bible, H.P. Lovecraft, and Pastor Martin Niemöller.

Havelock's Manifesto shifted among the past, present, and future tenses at seemingly random junctures. Thus, there were retrospective remarks, such as "Music did not make me kill," and "I could have used pipe bombs . . . ." The Manifesto also included prospective remarks:

But you have attacked my family. You have destroyed the futures of my children. So now, I will reciprocate in kind. Only mine will not be the slow crush of a life of a wage slave, or of malnutritioned [sic] sicknesses, or of insurmountable debt. It will be swift, and bloody. I will sacrifice your children upon the altar of your excess . . . .

. . . So I will make the ultimate sacrifice; I will give my life. And I will take as many of the baneful and ruinous ones with me.

. . .

I will slay your children. I will shed the blood of the innocent.

Although there were several indirect references to Super Bowl XLII, the sole mention of the event by name comes when Havelock muses, "Perhaps tshirthell.com or rottencotton.com will print up some cool tshirts [sic] like 'I SURVIVED SUPERBOWL XLII.' "

After leaving the post office, Havelock drove to a parking lot near the stadium "to wait for an opportunity to shoot people." He expected, in the process, to "commit suicide by cops." Minutes after arriving, however, Havelock experienced "a change of heart." Hysterical, he telephoned his fiancee and confessed to having "had bad thoughts." When they met soon thereafter, Havelock again explained "that he had [had] bad thoughts and he [had] threatened a lot of people in the letters." Havelock also told his parents that he had "done something terribly, terribly wrong," and that "[he] sent threatening letters."

Havelock needed no persuasion to go to the City of Tempe police station. There, he tendered the rifle and provided the Tempe police with copies of the materials in the media pack-

ets. The Tempe police notified the Federal Bureau of Investigation ("FBI"). About an hour later, agents of the FBI and the Bureau of Alcohol, Tobacco, and Firearms conducted a recorded interview with Havelock and took him into custody.

**B**

A federal grand jury indicted Havelock for six counts of mailing threatening communications in violation of § 876(c), corresponding to the four media outlets and the two websites to which Havelock mailed his Manifesto.[2] The threat, as alleged in each of the six counts, consisted of "a threat to injure the person of another, specifically children and persons in the vicinity of the Super Bowl XLII event in Arizona."

Havelock moved to dismiss the indictment. As relevant here, he argued that the phrase "any other person" in § 876(c) refers exclusively to natural persons and, because the media packets were addressed to corporations, the indictment failed to allege facts sufficient to constitute an offense. Havelock also argued that the media packets were devoid of a "threat to injure" because the communications did not threaten to injure immediately or in the future, but instead contained a "post-mortem confession or explanation of his actions, which never came to fruition."

The district court denied the motion to dismiss. It agreed that "any other person" referred exclusively to natural persons, but held that the jury could scrutinize the envelopes, salutation, and general contents of the media packets to determine whether they were addressed to natural persons. *United States v. Havelock*, 560 F. Supp. 2d 828, 830-31 (D. Ariz. 2008). The court further ruled that the question of whether the media packets contained true threats was a question of fact for the jury. *Id*. at 834.

---

[2]The indictment also included two counts of receiving a firearm with intent to commit murder in violation of 18 U.S.C. § 924(b), which the district court dismissed for lack of evidentiary support.

Havelock was tried before a jury. At the close of the evidence, Havelock moved for a judgment of acquittal, wherein he incorporated his motion to dismiss the indictment. The district court denied the motion.

The jury convicted Havelock on all six counts of mailing threatening communications in violation of § 876(c). The district court sentenced Havelock to a 366-day term of imprisonment followed by a 36-month term of supervised release.

Havelock appealed. He argued that the district court erred in interpreting § 876(c) to allow a trier of fact to consult the content of a mailed communication to determine whether it was addressed to a natural person. He further argued that his Manifesto qualified as political speech and did not constitute a "true threat," and therefore was entitled to First Amendment protection. Lastly, Havelock argued that there was insufficient evidence that he mailed the Manifesto with the specific intent to threaten any person.

A panel of this court reversed. *United States v. Havelock*, 619 F.3d 1091 (9th Cir. 2010). One judge dissented. *Id.* at 1098-1101. The panel majority held that § 876(c) requires that the mailed item containing the threatening communications be addressed to a natural person, as reflected in the address on the mailed item. *Id.* at 1092. The panel majority declined to reach Havelock's remaining arguments. *Id.* at 1098. We granted en banc review.

**II**

We review matters of statutory interpretation de novo. *Phoenix Mem'l Hosp. v. Sebelius*, 622 F.3d 1219, 1224 (9th Cir. 2010). Statutory interpretation focuses on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Section 876, mailing threatening communications, is currently part of Chapter 41

of Title 18 U.S.C., Extortion and Threats. Section (c), at issue here, makes it a felony to mail a communication "addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another." § 876(c).

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). That assumption, however, does not apply where Congress provides a statutory definition. *See United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999) (holding that in the absence of a statutory definition, a term should be accorded its ordinary meaning).

## A

**[1]** In the Dictionary Act, Congress provided definitions for a number of common statutory terms that courts are to apply "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise." 1 U.S.C. § 1. The Dictionary Act defines the term "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." *Id*. Although the Dictionary Act was enacted in 1947,[3] its broad definition of "person" is consistent with the one in the Dictionary Act of 1871, which was in effect when Congress first enacted the predecessor to § 876, 18 U.S.C. § 338a, in 1932: "the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense." Act of Feb. 25, 1871, Ch. 71, § 2, 16 Stat. 431.

---

[3]As originally enacted, the Dictionary Act provided that " 'person' may extend and be applied to partnerships and corporations, . . . unless the context shows that such words were intended to be used in a more limited sense." Act of July 30, 1947, Pub. L. No. 80-722, 61 Stat. 633.

**[2]** The Supreme Court has interpreted the contextual proviso of the Dictionary Act in *Rowland v. California Men's Colony*, 506 U.S. 194 (1993). There, the Court applied the definition of "person" to the *in forma pauperis* statute, 28 U.S.C. § 1915, and held that the context of that statute indicated that its use of "person" referred only to individuals, not to artificial entities. *Rowland*, 506 U.S. at 201-11.

The Court stated that "context" in 1 U.S.C. § 1 ("unless the context indicates otherwise"), means

> the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts, and this is simply an instance of the word's ordinary meaning: '[t]he part or parts of a discourse preceding or following a 'text' or passage or a word, or so intimately associated with it as to throw light upon its meaning.

*Id*. at 199 (quoting Webster's New International Dictionary 576 (2d ed. 1942)). "Context" does not extend to legislative history: "If Congress had meant to point . . . to legislative history . . . it would have been natural to use a more spacious phrase, like 'evidence of congressional intent,' in place of 'context.' " *Id*. at 200. In determining what a statute's context "indicates," the Court stated that the scope of "indicates" is broad. *Id*. The term "bespeaks something more than an express contrary definition," in which case ordinary rules of statutory construction would require that courts apply the specific definition over the general one. *Id*. "Indicates" also "imposes less of a burden than . . . 'requires' or 'necessitates' "; thus, a court need not conclude that the Dictionary Act's meaning would produce an absurd result. *Id*. at 200-01. The Court noted that this rule has been applied throughout the history of 1 U.S.C. § 1 and its predecessors. *Id*. at 200 n.3.

The Court held that four contextual features indicated that the word "person" as used in the *in forma pauperis* statute

referred only to individuals. *Id.* at 201. First, the statute assumed litigants could appear pro se, which indicated that Congress must have been thinking only in terms of natural persons. *Id.* at 203. Second, the statute required an affidavit supporting the person's "allegation of poverty," but artificial entities do not suffer poverty. *Id.* Third, it required the person to make an affidavit, which artificial entities cannot make because they cannot take oaths. *Id.* at 204. Finally, the statute provided no resolution of the question how to apply the statute's "inability to pay" standard to corporations, and "congressional silence on the subject indicates that Congress simply was not thinking in terms of granting in forma pauperis status to artificial entities." *Id.* at 207.

**[3]** We now proceed to apply the *Rowland* framework to "person" as used in § 876(c), keeping in mind that "context," as that term is used in the Dictionary Act, is "simply an instance of the word's ordinary meaning." *Rowland*, 506 U.S. at 199.[4]

**[4]** The term "person" is used no less than twelve times in § 876. *See* 18 U.S.C. § 876. The term is used in various associations, including: "release of any kidnapped person," "any

---

[4]The two other courts of appeal that discussed the meaning of "person" did not apply the *Rowland* framework and did not categorically decide whether "person" in § 876(c) is limited to natural persons. *See United States v. Rendelman*, 641 F.3d 36, 46 (4th Cir. 2011) (holding that a letter addressed to the Marshals Service "can reasonably be understood as addressed to the United States Marshal himself—a natural person," but that "the person or entity to whom the threatening communication is addressed is not an essential element of a § 876(c) offense" and the phrase "addressed to any other person" "simply means that an accused does not violate that provision by mailing a threatening letter addressed to himself"); *United States v. Williams*, 376 F.3d 1048, 1053-54 (10th Cir. 2004) (noting that its "holding that a communication addressed to a government official . . . falls within the ambit of the conduct proscribed by § 876" was "consistent" with two district court decisions and one unpublished Ninth Circuit decision that held that the communication must be addressed to a natural person).

threat to kidnap any person or any threat to injure the person of the addressee or of another," "the reputation of a deceased person, or any threat to accuse the addressee or any other person of a crime." *See id*. These associations clearly require that "person" mean a *natural* person. It simply makes no sense to threaten to kidnap a corporation, or injure "the person" of a corporation, or talk about a deceased corporation.

**[5]** "Person" is also used in the expression "addressed to any other person." *See*, *e.g.*, § 876(c) (prohibiting the mailing of "any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another"). "Since there is a presumption that a given term is used to mean the same thing throughout a statute, [the] presumption [is] surely at its most vigorous when a term is repeated within a given sentence." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). This common-sense and long-recognized presumption of uniformity counsels that "person" means a natural person in "addressed to any other person," as well. *See Brown*, 513 U.S. at 118.

We are, of course, cognizant that the presumption of uniformity gives way when "there is strong evidence that Congress did not intend the language to be used uniformly." *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 261 (2005) (O'Connor, J., concurring in judgment). Not only is such evidence missing here, but the statutory language compels our reading. Section 876(c) not only requires that the mail be "addressed to any other person," but that the offending communication contain "a threat to *injure the person of the addressee or of another*." § 876(c) (emphasis added). Although the statute does not require that the addressee and the person whom the threat concerns be one and the same, it clearly envisions that the addressee be a "person" that can be injured.

The clear statutory language disposes of the argument that "person" in "addressed to any other person" should be given the broadest meaning possible (and thus extend to non-natural persons) in order to avoid creating absurd results. First, we note that neither party advocated this position.[5] Second, limiting the statute to natural persons does not render the word "any" superfluous. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute."). "Any" does not qualify "person" on its own, but in conjunction with "other": "addressed to any other person." The meaning of this expression is clear —the communication must be addressed to any person other than the sender. *United States v. Rendelman*, 641 F.3d 36, 46 (4th Cir. 2011). Third, it is true that limiting "person" to natural persons would insulate from criminal liability under § 876(c) the mailing of an offending communication addressed to non-natural entities. But this is not an absurd result. One of the purposes of § 876 is "the preservation of the recipient's sense of personal safety." *United States v. Aman*, 31 F.3d 550, 555 (7th Cir. 1994). The recipient's sense of personal safety is simply not implicated when the recipient is an entity.

**[6]** Furthermore, we are not in the business of rewriting the law, but that of interpreting Congress's words when it enacted the statute. "[T]he fact that Congress might have acted with greater clarity or foresight does not give courts a carte blanche to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do." *United States v. Locke*, 471 U.S. 84, 95 (1985). This admonition takes on a particular importance when the Court construes criminal laws. *United States v. Granderson*, 511 U.S. 39, 69 (1994) (Kennedy, J.,

---

[5]By this, we do not mean to imply that we are bound by the parties' statement of the law. *See United States v. Ogles*, 440 F.3d 1095, 1099 (9th Cir. 2006) ("We are not bound by a party's concession as to the meaning of the law, even if that party is the government and even in the context of a criminal case.").

concurring in judgment). "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971). The Congress's definition of the activity prohibited under § 876(c) compels the conclusion that "person" refers exclusively to natural persons throughout that subsection.

Textual cross-reference to related statutes confirms this conclusion. Section 875, like § 876, is part of Chapter 41, Extortions and Threats, and uses language comparable to § 876. *See* 18 U.S.C. § 875. Section 875 makes it a felony for someone to transmit in interstate or foreign commerce certain communications "with intent to extort from any person, firm, association, or corporation." *Id*. § 875 (c), (d). Thus, § 875 clearly envisions that "person" is limited to a natural person and that the statute, by referring to "firm, association, or corporation," applies to both natural and non-natural persons. Although the predecessors to §§ 875 and 876 were not enacted as part of the same act, Congress explicitly referenced § 876's predecessor, 18 U.S.C. § 338a (1932), when it enacted § 875's predecessor, 18 U.S.C. § 408d (1934). *See* Act of May 18, 1934, Ch. 300, 48 Stat. 781 ("*Provided further*. That nothing herein shall amend or repeal section 338a, title 18, United States Code (47 Stat. 649).") (emphasis in original). This explicit reference to § 876's predecessor is persuasive evidence that Congress's use of "person, firm, association, or corporation" in § 875 and its predecessor was not accidental, but a deliberate decision to enlarge the reach of the statute beyond that of § 876, which was limited to "person."

**[7]** In sum, three contextual features indicate that the word "person" as used in § 876(c) does not encompass the broad definition in the Dictionary Act. *See Rowland*, 506 U.S. at 199-201. First, § 876 prohibits the mailing of communications that contain threats to kidnap or injure "the person" of another, both of which are harms that can only be inflicted on

natural persons. Second, the communication must be "addressed to any other person" and must contain a threat to injure "the person of the addressee or of another," which indicates that the addressee must also be a natural person. Third, the related § 875 employs the term "person" in the limited sense of a natural person. *See* 18 U.S.C. § 875(c), (d) (prohibiting the transmission of threatening communications in interstate or foreign commerce, "with intent to extort from any person, firm, association, or corporation, any money or other thing of value"). We therefore hold that the term "person," as used in § 876(c), is limited to natural persons.

**B**

Havelock argues that, as charged in the indictment, his communications were not addressed to natural persons, but to newspapers and websites.[6] Havelock's contention requires us to decipher the meaning of the term "addressed to," as used in § 876(c), to determine whether we may look beyond the outside of the envelope or the salutation line to the content of the communication in order to identify the addressee.

"[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Gonzalez*, 492 F.3d 1031, 1041 (9th Cir. 2007) (internal quotations omitted). "[T]he structure and purpose of a statute may also provide guidance in determining the plain meaning of its provisions." *Bailey v. Hill*, 599 F.3d

---

[6]Although the address on the face of the media packet addressed to theshizz.org included the name of a natural person (Donald Martinez) in addition to the website, the indictment did not name Martinez as the addressee. Instead, the indictment charged Havelock with "knowingly deposit[ing] in the United States mail, with intent to threaten, a communication, addressed to 'THESHIZZ.ORG' containing a threat to injure the person of another." The government has not argued that the package mailed to theshizz.org was addressed to a natural individual by reason of the inclusion of Martinez's name in the address on the outside of the package. Any argument to that effect is therefore waived.

976, 980 (9th Cir. 2010). In order to determine the ordinary meaning of a term, courts routinely rely on dictionary definitions. *See*, *e.g.*, *Johnson v. United States*, 130 S. Ct. 1265, 1270 (2010) (relying on dictionary definition to determine the ordinary meaning of the term "physical force").

**[8]** Excluding those meanings that are obviously inapplicable, *see id.*, the verb "address" means "to write or otherwise mark directions for delivery on" a letter, and "to speak, write, or otherwise communicate directly to." Webster's Third Int'l Dictionary 24 (1976). The legislative history of the statute supports the former definition. As initially enacted, § 876's predecessor was designated as an offense against the postal service. *See* Act of July 8, 1932, ch. 464, § 1, 47 Stat. 649; 18 U.S.C. § 338a (1932).**[7]** This suggests that the term "address" refers to the directions for delivery of a piece of mail. *See*, *e.g.*, United States Postal Service, *Domestic Mail Manual* § 602.1.2 ("The delivery address specifies the location to which the USPS is to deliver a mailpiece. [T]he piece must have the address . . . only on the side of the piece bearing postage."). The language and structure of § 876, however, favors a broader meaning.

Section 876(c) applies to "[w]hoever knowingly *so* deposits or causes to be delivered, *as aforesaid*" certain forms of threatening communications. § 876(c) (emphasis added). The antecedents of "so" and "aforesaid" are found in subsection (a), which describes the act of "knowingly deposit[ing] in any post office or authorized depository for mail matter, to be *sent or delivered by the Postal Service* or knowingly caus[ing] to be delivered by the Postal Service *according to the direction thereon*" certain forms of threatening communications. 18 U.S.C. § 876(a) (emphasis added). In light of the context— namely, the depositing of mail matter—the phrase "the direc-

---

**[7]**The offense was recodified as § 876 and became part of Title 18, Chapter 41, Extortion and Threats, in 1948. *See* Act of June 25, 1948, ch. 645, 62 Stat. 741.

tion thereon" clearly refers to the delivery directions super-scribed on an envelope or other packaging.

**[9]** Under § 876(c), a defendant must not only "deposit[ ] or cause to be delivered as aforesaid" a communication, but also his communication must be "with or without a name or designating mark subscribed thereto, addressed to any other person and contain[ ] any threat to kidnap any person or any threat to injure the person of the addressee or of another." § 876(c). In view of the structure of this section and its importation of the mailing requirements in subsection (a), we conclude that subsection (c) addresses the requirements that the communication must meet in order to fall under the purview of § 876(c). In other words, while subsection (a) concerns the instructions for mailing or delivery, which are necessarily on the outside of the letter or of the package, subsection (c)—including the "address to any other person" requirement—concerns the communication inside the letter or package.

It is common sense that, where not otherwise specified, a communication is presumed to be addressed to the person or entity identified in the delivery instructions on the outside of the envelope or the package. It is also common sense that, if a communication is addressed to someone other than the person or entity in the delivery instructions, the identity of the addressee is often times specified in the salutation line. The question is whether a court may look beyond these places, to the content of the communication, to identify the addressee.

**[10]** The two courts of appeals that have addressed the issue have found it proper. In *United States v. Williams*, 376 F.3d 1048 (10th Cir. 2004), the Tenth Circuit held that a trier of fact can consider, "at a minimum, both the envelope and the salutation of a letter" in determining whether the letter is "addressed to any other person" within the meaning of § 876(c). *Id.* at 1052. Thus, the court ruled, a reasonable jury could find that the letters in question—the envelopes for which were addressed to government offices, such as "United

States Attorney's Office," and the salutations of which included official titles, such as "Hey, U.S. Attorney"—were addressed to a natural person. *Id.* at 1051, 1053-54. The court reasoned:

> The definition of "address" includes "to speak, write, or otherwise communicate directly to." The definition of "address" does not exclude the salutation of a letter. . . . Section 876 proscribes the mailing of a threatening *communication* which is "addressed to any other person." The word "communication" *includes the contents of a letter*. Thus, at a minimum, the envelope and the salutation of a letter can both be considered in determining whether a communication is "addressed to any other person" within the meaning of § 876.

*Id.* at 1052-53 (citations omitted) (emphasis on "communication" in original; emphasis on "includes the contents of a letter" added).

In *Rendelman*, a Fourth Circuit case, the defendant was charged, among other counts, with mailing a letter addressed to "U.S. Marshall's [sic] Service, Federal Building, 501 I Street, Sacramento, CA" and containing a threat to injure "officers and employees of the United States engaged in the performance of official duties and covered by [18 U.S.C. § 1114,] as follows: 'the President and the White House employees.' " *Rendelman*, 641 F.3d at 40. This latter allegation, if proved, resulted in a higher sentence under the enhancement provision of § 876(c): "If such a communication is addressed to a United States judge, a Federal law enforcement officer, or an official who is covered by section 1114, the individual shall be fined under this title, imprisoned not more than 10 years, or both." § 876(c).

Rendelman argued that his letter was addressed to the Marshals Service, not the President, therefore the indictment was

defective as it concerned the enhancement element. *Rendelman*, 641 F.3d at 46-47. The Fourth Circuit held that the "threat contained in the . . . [l]etter was sufficiently alleged as being 'addressed to', i.e., 'directed to,' the President and White House employees, even though the letter was not mailed to them." *Id.* at 47.

Rendelman also challenged the sufficiency of the evidence supporting the jury's verdict on the enhancement element. *Id.* at 48. The court held the issue "turns on the meaning of 'addressed to,' as it is used in the Enhancement Element." *Id.* After noting the conflict between the panel majority's opinion in this case and the *Williams* opinion, the Fourth Circuit agreed with *Williams*:

> At its essence, § 876(c) criminalizes the use of the postal system to deliver a threatening communication. Indeed, that subsection deals with threatening communications and not just the envelopes containing them. Hence, a threatening communication includes more than the envelope—it includes the contents thereof.

*Id.* The court then noted that § 876(c) uses the term "addressed to" twice, once in the first sentence (at issue here) and then again in the enhancement provision:

> In the Mailing Element of Count Seven, the term "addressed to" referred to the Marshals Service in California, as reflected on the envelope. . . . On the other hand, the Enhancement Element alleged that the communication contained a "threat to injure" the President and White House employees. In evaluating the evidence, the jury was entitled to find—as it did —that the envelope was "addressed to" the Marshals Service, but that the "threat to injure" was "addressed to" the President and others.

*Id*. at 48-49.

**[11]** Fundamental to both the *Williams* and *Rendelman* opinions is the common-sense argument that § 876(c) prohibits the mailing of threatening communications, and that a communication is not limited to the envelope or the packaging, but includes its contents. Therefore, a court may consult the contents of a communication to determine to whom it is addressed.[8] We agree and note that the structure of § 876(c) supports this interpretation. As stated above, to fall under the purview of § 876(c), a communication must meet three requirements. The first requirement, "with or without a name or designating mark subscribed thereto," addresses a specific component of a communication, the signature. By contrast, the second and third requirements, "addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another," appear to refer to the whole of the communication.[9]

---

[8]While we are persuaded by *Rendelman's* analysis that a communication in § 876(c) includes more than the envelope and packaging, we take no position on its specific holding that the letter was "addressed" to the President simply because it contained a threat to the President.

[9]After a thorough review of the legislative history of § 876(c), we can find no evidence that our interpretation of the statute is inconsistent with the "clearly expressed legislative intention." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). Congress enacted 18 U.S.C. § 338a, the predecessor statute to § 876(c), as a companion to the Lindbergh Law, which was, itself, intended to "permit [federal] officers to disregard state boundaries in the pursuit of kidnapers" and, together with § 338a, to "supply missing defenses against kidnaping." Horace Bomar, Jr, *The Lindbergh Law*, 1 Law & Contemp. Probs. 435, 435, 444 (1934); *see* S. Rep. No. 72-498, 1 (1932) (stating that H.R. 96, the bill that became § 338a, was "introduced . . . to curb the growing practice of using the mails for sending to intended victims demands for money and dire threats of confinement or death"). Nothing in the history speaks to the issue before us, but it is clear that the concerns motivating enactment of § 338a exist not only when the natural person addressee is explicitly specified on the envelope, but also when the person's identity is revealed by the contents of the communication.

**[12]** We hold that in order to determine whom a threatening communication is "addressed to," a court may consult the directions on the outside of the envelope or the packaging, the salutation line, if any, and the contents of the communication.

### C

**[13]** Here, as charged in the indictment, Havelock's mailings were all addressed to newspapers and websites. The Manifesto, the only writing that the government alleges contained threats, has no salutation line. Even looking to the contents of the Manifesto, it indicates nothing at all about the identity of any individual "person" to whom the communication supposedly was addressed. A few of Havelock's statements appeared to be addressed to whoever happened to read them: e.g., "I will slay your children." It is impossible to determine (and is highly unlikely) that Havelock, in the quoted phrase, was addressing any particular person whose children he was going to slay.[10] On this record, we conclude that a reasonable jury could not have found that Havelock's writings were addressed to a natural person, as § 876(c) requires.

### III

**[14]** The term "person" as used in § 876(c) refers exclusively to natural persons. To determine whether a threatening communication is "addressed to any other person," § 876(c), a court may consult the directions on the outside of the envelope, the salutation line, and the contents of the communication. Havelock's writings were not addressed to natural persons. Accordingly, we reverse Havelock's convictions and

---

[10]Of course, a threat to kill any children qualifies as a *threat* made to the person "of another" than the addressee. § 876(c). But that threat alone is not enough to satisfy the requirement that the *communication* be addressed to "any other person" than the sender. *Id*.

remand to the district court for the entry of a judgment of acquittal.[11]

**REVERSED AND REMANDED FOR THE ENTRY OF A JUDGMENT OF ACQUITTAL.**

---

N. R. SMITH, Circuit Judge, concurring in the result:

I agree with the majority's conclusion, but not with its analysis. The majority reads 18 U.S.C. § 876(c) too narrowly when it concludes that § 876(c) refers exclusively to mailing threatening communications to natural persons. Section 876(c) also prohibits mailing threatening communications to corporations and other entities. I, therefore, do not join the majority's analysis of the meaning of the term "person" in § 876(c). However, Havelock's convictions should be reversed, because the government did not present any evidence that Havelock had a specific intent to threaten when he mailed the "media packets."

## I

In this case, we are called upon to interpret 18 U.S.C. § 876(c). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Thus, to determine the meaning of "person" in § 876(c), we must examine both § 876(c) and the language and design of § 876 as a whole. 18 U.S.C. § 876 states:

---

[11]Because we conclude that Havelock's writings were not addressed to natural persons, we need not reach Havelock's contention that his writings were political speech protected by the First Amendment and not "true threats" "to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003); *see also United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011).

(a) Whoever knowingly deposits in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service or knowingly causes to be delivered by the Postal Service according to the direction thereon, any communication, with or without a name or designating mark subscribed thereto, addressed to any other person, and containing any demand or request for ransom or reward for the release of any kidnapped person, shall be fined under this title or imprisoned not more than twenty years, or both.

(b) Whoever, with intent to extort from any person any money or other thing of value, so deposits, or causes to be delivered, as aforesaid, any communication containing any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than twenty years, or both.

(c) Whoever knowingly so deposits or causes to be delivered as aforesaid, any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to kidnap any person or any threat to injury the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both. If such a communication is addressed to a United States judge, a Federal law enforcement officer, or an official who is covered by section 1114, the individual shall be fined under this title, imprisoned not more than 10 years, or both.

(d) Whoever, with intent to extort from any person any money or other thing of value, knowingly so deposits or causes to be delivered, as aforesaid, any communication, with or without a name or designating mark subscribed thereto, addressed to any other

person and containing any threat to injure the property or reputation of the addressee or of another, or the reputation of a deceased person, or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both. If such a communication is addressed to a United States judge, a Federal law enforcement officer, or an official who is covered by section 1114, the individual shall be fined under this title, imprisoned not more than 10 years, or both.

## A

"Statutory interpretation must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (internal quotations omitted). However, "[o]nly in the absence of a statutory definition does this court normally look to the ordinary meaning or dictionary definition of a term." *United States v. Lettiere*, 640 F.3d 1271, 1274 (9th Cir. 2011).

In this statute, the term "person" has a statutory definition provided by the Dictionary Act. The Dictionary Act defines "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. This definition of "person" applies when determining the meaning of a statute "unless the context indicates otherwise." *Id.* "Context" is "the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts." *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 199 (1993). Thus, the Dictionary Act definition of "person" applies every time the term is used in a statute, unless the context indicates otherwise.

## B

While there is a "presumption that a given term is used to mean the same thing throughout a statute," *Brown v. Gardner*,

513 U.S. 115, 118 (1994), "this presumption is not absolute." *Barber v. Thomas*, 130 S. Ct. 2499, 2506 (2010).

> [T]he presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent. Where the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legis-lative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those pur-poses are expressed, and of the circumstances under which the language was employed.

*Atl. Cleaners & Dyers v. United States*, 286 U.S. 427 (1932). Put differently, the presumption of uniformity "relents when a word used has several commonly understood meanings among which a speaker can alternate in the course of an ordi-nary conversation, without being confused or getting confus-ing." *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595-96 (2004). "Statutory language must be read in context [because] a phrase gathers meaning from the words around it." *Id.* at 596 (internal quotation marks omitted). Thus, "[i]dentical words appearing more than once in the same act, and even in the same section, may be construed differently if it appears they were used in different places with different intent." *Vanscoter v. Sullivan*, 920 F.2d 1441, 1448 (9th Cir. 1990) (citing *Atl. Cleaners & Dyers*, 286 U.S. at 433).

## C

Section 876(c) begins with the clause: "Whoever know-ingly so deposits or causes to be delivered as aforesaid . . . ." The phrase "knowingly so deposits or causes to be delivered

as aforesaid" refers to the opening clauses in § 876(a): "Whoever knowingly deposits in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service or knowingly causes to be delivered by the Postal Service according to the direction thereon . . . ." Because § 876(c) refers to § 876(a), the principles of statutory construction require us to examine the use of "person" in § 876(a) in deciding how to interpret § 876 ). *See K Mart Corp.*, 486 U.S. at 291.

The first instance where "person" appears in § 876(a), the phrase "addressed to any other person," must be interpreted by the statutory Dictionary Act definition of "person." The statutory Dictionary Act definition may also be used, because the context does not indicate otherwise. One could address communications to both natural persons and entities. Communications regarding demands or requests for ransom or rewards could be addressed to entities such as corporations just as easily as they could be addressed to natural persons. *See Diaz v. Gates*, 420 F.3d 897, 905 (9th Cir. 2005) (discussing hypothetical scenario where businesses pay ransoms for their kidnapped business executives). Therefore, the Dictionary Act definition of "person" is proper in interpreting the phrase "addressed to any other person."

In contrast, the context indicates otherwise regarding the second instance where "person" appears in § 876(a)—"release of any kidnapped person." The context indicates that the Dictionary Act definition of "person" does not apply to that particular phrase, because an entity such as a corporation cannot be kidnapped. Thus, the use of "person" in that phrase indicates a natural person definition of the term.

Examining the other instances where "person" is used in § 876 reveals the same pattern: the statute uses the statutory Dictionary Act definition unless the context of a particular phrase indicates otherwise.

Other phrases that use the Dictionary Act definition of "person" include "with intent to extort from any person," 18 U.S.C. § 876(b) and (d), and "any threat to accuse the addressee or any other person of a crime," *id.* § 876(d). Those phrases use the Dictionary Act definition, because their context does not indicate otherwise. Corporations and other entities may be threatened with extortion or accused of crimes. *See, e.g.*, *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) (stating that defendant engaged in scheme for the purpose of extorting money from a limited partnership); *Boise Dodge, Inc. v. United States*, 406 F.2d 771, 772 (9th Cir. 1969) (per curiam) (mentioning the established rule that a corporation, through the conduct of its agents and employees, may be convicted of a crime).

The majority points out that a natural person definition of "person" must necessarily be used in the phrases "any threat to kidnap any person or any threat to injure the person of the addressee or of another," *id.* § 876(b), and "the reputation of a deceased person, or any threat to accuse the addressee or any other person of a crime," *id.* § 876(d). Indeed, the context of those particular phrases indicates they do not use the statutory Dictionary Act definition of "person." Corporations or other entities cannot be injured in their person, and there is no such thing as a deceased entity or corporation.

Because the context of some phrases in § 876 indicates they do not use the Dictionary Act definition, the majority mistakenly suggests that those phrases "clearly require that 'person' mean a *natural* person" throughout the statute. However, the majority's conclusion appears to rest on faulty statutory interpretation. The context of each use of "person" in § 876 indicates that the statute instead alternates between two commonly understood meanings: the Dictionary Act definition and a natural person definition. The particular phrases, that use a natural person definition of "person," share a context that indicates they use that definition instead of the statutory Dictionary Act definition. Those phrases gather a natural per-

son meaning from the words like "kidnap," "injure the person," or "deceased" around the uses of "person" in those phrases. Conversely, the other phrases using the term "person" in § 876 do not share that context, and so the statutory Dictionary Act definition is applicable.

This use of two different definitions of "person" in the same statute, or even in the same sentence, is not confused or confusing. *See Gen. Dynamics*, 540 U.S. at 595-96. The context and the words around each use of "person" show which definition applies to each use. A speaker in an ordinary conversation, for example, could alternate between the Dictionary Act and natural person definitions in § 876(a), so that the provision would prohibit threatening communications, regarding the kidnapping of natural persons, mailed to natural persons and mailed to entities.

**D**

Given the statutory interpretation of § 876(a), we then use it in interpreting § 876(c). The first instance where the term "person" is used in § 876(c), the phrase "addressed to any other person," must be interpreted by the statutory Dictionary Act definition of "person." Like the context of the phrase "addressed to any other person" in § 876(a), the context of this phrase also does not indicate that the phrase uses another definition of "person." Thus, the phrase "addressed to any other person" in § 876(c) should be interpreted in the same manner. Without any context indicating otherwise, the statutory Dictionary Act definition of "person" is applicable.

The next two instances where "person" is used in § 876(c), the phrases "threat to kidnap any person" and "threat to injure the person of the addressee or of another," instead use a natural person definition. As seen above with similar phrases from other parts of § 876, the context of these phrases indicates they do not use the Dictionary Act definition of "person." An entity such as a corporation cannot be kidnapped or injured in

its person. While the latter two phrases use a natural person definition, that does not imply that the phrase "addressed to any other person" must also use a natural person definition. The context and words around each use of "person" in § 876(c) indicate which definition applies to each use. Only the latter two phrases in the clause necessarily require that "person" mean a natural person, because those uses of "person" gather meaning from the words "kidnap" and "injure" around them.

In fact, the phrase "threat to injure the person of the addressee or of another," does not require that the "person" receiving the communication be a natural person. According to that phrase, the recipient of the threatening communication does not need to be the target of the threat of injury. The communication only need to threaten to injure the person of the addressee or another. For example, a communication could be addressed to a corporation and contain a threat to injure the person of a natural person employed at that corporation. In other words, it is the target of the threat who must be capable of being injured, not the recipient of the communication.

In sum, § 876(c) prohibits mailing threatening communications to natural persons and to corporations and other entities.

## II

The majority's argument that § 876(c) refers only to natural persons, because it should be read in concert with § 875, is unavailing. I generally endorse some of Judge Fisher's comments on interpreting § 876 with § 875, with the following additional comments.

While it is true that "context" includes "texts of other related congressional Acts," *Rowland*, 506 U.S. at 199, the majority does not demonstrate that the enactment of § 875 is in any way related to the enactment of § 876. Indeed, the majority admits that the predecessors to §§ 875 and 876 were

not enacted as part of the same act. Also, while the context of a statute does not extend to its legislative history, *see id.* at 200, the majority has pointed to no statutory history that otherwise indicates § 875 is related to § 876.

Other Congressional acts may be related to a statute at issue if they "help illuminate the meaning" of the statute. *See Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 778 (9th Cir. 2008). The majority, however, does not establish that § 875 helps illuminate the meaning of § 876.

Without a stronger demonstration of why § 875 is related to § 876, I am not convinced that § 875 helps to interpret the meaning of § 876.

### III

I would also renew Judge Graber's argument that limiting the meaning of "person" in § 876(c) to natural persons produces absurd results. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

As Judge Graber highlighted in her dissent to the three-judge panel's decision, the purpose of § 876 is "to deter the sending of death threats and threats of bodily injury." *United States v. Havelock*, 619 F.3d 1091, 1100 (9th Cir. 2010) (Graber, J., dissenting). When Congress first enacted § 876, it "went to some trouble to define broadly the prohibited communications—the original version of § 876 expressly covered 'any' letter or other communication, written or printed, with or without any sort of signature, sent by almost any conceivable method of mailing, containing a threat against either the addressee or another." *Id.* at 1099. The current version of § 876(c) contains similarly broad language: it prohibits *"any* communication with or without a name or des-

ignating mark subscribed thereto, addressed to *any* other person and containing any threat to kidnap *any* person or *any* threat to injury the person of the addressee or of another." 18 U.S.C. § 876(c) (emphases added). Thus, "[a]t its essence, § 876(c) criminalizes the use of the postal system to deliver a threatening communication." *United States v. Rendelman*, 641 F.3d 36, 48 (4th Cir. 2011).

The majority's narrow interpretation of § 876(c) runs counter to the broad legislative purpose of § 876, by insulating senders of death threats and threats of bodily injury from liability so long as they carefully (or accidentally) address their threatening communications to entities and not to natural persons. *See Havelock*, 619 F.3d 1091 at 1099-1100 (Graber, J., dissenting). The majority's interpretation thus produces absurd results through substantially frustrating the purpose of § 876(c). *See id.; see also Rowland*, 506 U.S. at 210 (discussing cases where the Supreme Court held that the Dictionary Act definition of "person" applied to statutes, because a natural person definition would have "substantially frustrated" the purposes of those statutes). In contrast, applying the Dictionary Act definition of "person," except where the context indicates otherwise, supports § 876's broad legislative purpose of deterring threatening communications. *See Havelock*, 619 F.3d 1091 at 1100 (Graber, J., dissenting); *see also Rendelman*, 641 F.3d at 48.

Because a natural person definition of "person" throughout § 876 produces absurd results and because the Dictionary Act definition of "person" accords with § 876's legislative purpose of deterring threatening communications, I cannot agree with the majority's interpretation of § 876(c).

## IV

Finally, because I disagree with the manner in which the majority reached its conclusion in this case but in the end agree with the majority's ultimate conclusion (that Have-

lock's six convictions should be reversed), I must briefly address the manner in which I get to that conclusion. In general, I support Judge Reinhardt's view as to "specific intent to threaten."

## A

In *United States v. Twine,* 853 F.2d 676, 679-81 (9th Cir. 1988), we determined that convictions under 18 U.S.C. § 876 require the government to prove the specific intent to threaten. While we acknowledged that requirement was endorsed by only some of our sister circuits, we have never overruled *Twine. E.g.*, *United States v. King*, 122 F.3d 808 (9th Cir. 1997). Therefore, in order to prove Havelock's convictions, the government bears a higher burden of proof. The government must prove that Havelock had a specific intent to threaten when he mailed the "media packets." Prior to trial, Havelock moved to dismiss the indictment, partially because the "media packets" were devoid of "any threat to injure." He argued that the packets instead contained an explanation of his violent actions (to be read after the fact). At the close of the evidence, Havelock moved for a judgment of acquittal. In support of his motion, he made the same arguments he had presented in the motion to dismiss. The district court denied both motions. Now he challenges the sufficiency of the evidence for the jury to make such a finding.

When a claim of sufficiency of evidence is preserved by making a motion for acquittal at the close of the evidence, this court reviews the district court's denial of the motion de novo. *See United States v. Munoz,* 233 F.3d 1117, 1129 (9th Cir. 2000), *superceded by statute on other grounds*, 18 U.S.C. § 1341. There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *United States v. Crawford,* 239 F.3d 1086, 1092 (9th Cir. 2001).

Reviewing the evidence in this record, Havelock was correct. The totality of the evidence shows that Havelock intended the "media packet" envelopes to be read after he died. He intended the "media packet" to be a Manifesto explaining what he believed to be wrong in this world and why he did what he did.

Havelock mailed the envelopes just prior to going to the Super Bowl that day with his newly purchased rifle and ammunition. After leaving the post office, he drove to a parking lot near the Super Bowl stadium. He never followed through with the actions he had previously contemplated.

There is no proof that Havelock specifically intended to threaten, if the envelopes were posted on a Sunday and the acts were to later occur on that very day. The mail would not even be delivered until at least the day after the Super Bowl. He did not intend anyone reading the "media packet" to be threatened by future harm or additional harm from him. Reviewing the "media packet," it mostly contains statements of the perceived social ills of modern society and numerous quotations from and references to the Bible, popular music, movies, bumper stickers, literature, and the Founding Fathers. Though containing statements of harm in the future tense, the "media packet" demonstrates that Havelock planned to commit "suicide by cops," showing that he intended the "media packet" not to be read by anyone until after he was already dead. When reporting his actions to the Tempe police, the police could not even determine whether a crime had been committed. Based on this evidence, the government did not prove that Havelock had the specific intent to harm someone.

**B**

The Supreme Court has held that certain threatening communications (called "true threats") are a form of speech but do not merit First Amendment protection. *See Virginia v. Black,* 538 U.S. 343, 359 (2003). While Judge Reinhardt may be cor-

rect that these communications were not true threats (or threats at all), my conclusion is rather based on the failure to prove "specific intent to threaten." I stop there because we do not undertake Constitutional analysis unless there is no other basis for deciding a case. *E.g.*, *United States v. Kaluna*, 192 F.3d 1188, 1197 (9th Cir. 1999). Because we may resolve this matter based on the government's failure to prove "specific intent to threaten," I do not reach the question of whether Havelock's communications were true threats.

## V

In conclusion, I do not join the majority's analysis of the meaning of "person" in 18 U.S.C. § 876(c). However, the majority correctly reverses Havelock's criminal convictions. I therefore concur in the result.

---

REINHARDT, Circuit Judge, concurring in part and dissenting in part. Part I is joined by Judge WARDLAW and Judge BERZON. Part II is joined by Judge SCHROEDER:

Writing and mailing off to the media a largely incomprehensible diatribe with vague allusions to evil acts that the author intended to have accomplished by the time his Manifesto was received was the unwise act of a troubled mind. It was not, however, criminal behavior that satisfies either of the two elements required for a conviction under 18 U.S.C. § 876(c). I concur with the majority's reversal of Havelock's criminal conviction and with its holding that a communication must be addressed to a natural person. Unfortunately, the majority's subsequent discussion, which concludes that the identity of the addressee can be discovered anywhere within the body of the document, renders irrelevant the holding on which its decision is based, and totally eliminates one of the two essential elements required by the statute.

The statutory text clearly sets forth two elements. Specifically, it requires that 1) the communication be addressed to a person, and 2) the communication *contain a threat* to a person. By permitting courts to look to the entire document in order to identify an "addressee," the majority ignores the context of the statute: the term addressee is used in relation to the posting of mail at the post office or in a mail box. The opinion holds, in effect, that whenever a threat against a person is contained in the body of the communication, the subject or object of the threat may also serve as the addressee. This makes little sense with respect to the particular statute before us. I therefore write separately to express my disagreement with Section II.B of the majority's opinion.

Before I do so, however, I explain why the confusion and inconsistency created by the majority opinion (which I nevertheless concur in, in part) is unnecessary. There is a simpler and clearer basis for reversing Havelock's conviction. Beside the majority's inability to locate an "addressee" buried within the content of his Manifesto, there is another more substantial reason why Havelock's ramblings do not violate 18 U.S.C. § 876(c). That reason is that Havelock's Manifesto does not contain a threat. Even if the Manifesto could be construed as referring to an identifiable group of persons attending a particular event, which I seriously doubt, it was intended to arrive after the occurrence of that event. A threat can refer only to a future, not a past, act; a threat is an act that is intended to put its subjects or objects in fear of an event to occur in the future. Put simply, a communication sent when and under the circumstances Havelock's was cannot induce fear of an impending event, and is therefore not a threat.

In sum, while the majority decides the case in a confused and incorrect manner based on the first element, finding that the communication lacked a natural person addressee, I would decide this case on the more basic question presented by the

second element, and hold that the Manifesto did not contain a threat.[1]

I

The assorted writings mailed to the six news and music out-lets which arguably refer to an event that Havelock expected to have taken place before the communications were received —the Superbowl—did not meet the legal requirements for a threat, and were thus not punishable by § 876(c).

A threat must "communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003); *see also United States v. Stewart*, 420 F.3d 1007, 1017(2005). Havelock's rambling Manifesto included statements ranging from excoriations against the economic and political system to quotations from popular songs and films to critiques of video games. Among his pronouncements was the declaration that "I will sacrifice your children upon the altar of your excess, and know it has been your own greed, your loftiness, your disdain and mistreatment of your fellow man that has done this." The Manifesto also included the profession that "I will shed the blood of the innocent. For the blood of the guilty will always remain unclean. And other dregs of society will always quickly lap up the blood of the unclean, take their place, and carry on as if nothing happened. Meet the new boss, same as the old boss." Included within the Manifesto was also the nonsensical explanation, "Oh yeah, Cthulhu made me kill! Ia! Ia! Cthulhu Ftaghn!"

---

[1]Havelock also argued that his Manifesto was political speech and as such it deserves First Amendment protection. As the Supreme Court has recognized, constitutional protections afforded to speech do not extend to "true threats," which have been defined as threats communicated by the speaker with the specific intent to threaten. *Virginia v. Black*, 538 U.S. 343 (2003). Because Havelock's writings were not a threat in any sense of the word, I need not reach the constitutional question he raises.

The Manifesto clearly contains statements alluding to acts of violence, from running people over with a Hummer to killing the children of his unidentified perceived oppressor. None of this language identifies a person or group of persons who might constitute the objects or subjects of any threat. In the final lines of the Manifesto, preceding quotations from the Old Testament and the punk rock group Bad Religion, is the only oblique reference to the Superbowl and those in attendance. I do not believe that, by its reference to a t-shirt containing the message "I survived the Superbowl," the Manifesto sufficiently identifies an intent on the part of Havelock to commit a violent act regarding that event. Because some of my colleagues appear to disagree, however, I explain here why even if it did, we could not hold that the Manifesto contains a threat. In any event, it is clear that no other part of the Manifesto identifies any particular individual or group of individuals as the intended objects of a threat or identifies any time, place, or event at which any act of violence will occur.

A threat is "an expression of an intention to inflict evil, injury, or damage on another," *Planned Parenthood of Columbia v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002) (en banc), or an "indication of impending danger or harm." *United States v. Davila*, 461 F.3d 461, 302 (2nd Cir. 2006). Threats are by definition prospective. *See* Webster's New World Dictionary 1394 (3rd Coll. ed. 1988) (defining a "threat" as "an expression of intention to hurt"). They may include announcements of future or impending action, but not statements regarding past events or retrospective harm. As the Supreme Court has recognized, the prohibition on "threats protect[s] individuals from the fear of violence and from the disruption that fear engenders," *Black*, 538 U.S. at 360 (alteration in original) (internal citation omitted). Havelock's statements were intended to be, and could only have been, understood by the recipients as a post hoc confession of his already completed actions. Having deposited the Manifesto in a United States Postal Service mailbox on the very day of the Superbowl, a mere thirty minutes before

his intended rampage at the stadium, Havelock's Manifesto could not have reached its intended destinations in time to put the recipients in fear of imminent danger or to constitute a threat of future action. To the contrary, the mailings sent by Havelock containing his Manifesto could only have arrived after the events alluded to within its pages had already taken place or after any possibility of committing the acts no longer existed.

When determining whether a defendant's speech represents a threat our analysis is "not confine[d] . . . to the defendant's statements alone," *United States v. Bagdasarian*, 652 F.3d 1113, 1123 (2011), but must consider the context in which the communication was made as well. Considering the context, it would be impossible to conclude that Havelock's often-rambling statements constituted a threat, no matter how troubling those statements may have been. It is clear from the fact that none of the statements could have been read by anyone until after the only event referred to in that document that could arguably be the subject of a threat had already taken place that the Manifesto lacked any capacity to threaten any injury or express any intent to cause the victims future harm or fear of future harm. In short: under all the circumstances, and in context, the language of the Manifesto could not constitute a threat.

Finally, Havelock's related writings make it clear that he intended the media packets and letters mailed the day of the Superbowl to be examined and understood in the wake of the already completed actions that he did not expect to survive. It is therefore not possible that he could have intended to put the recipients in fear of any future actions on his part because, as Havelock acknowledged within his letters, he would be dead by the time that the communications reached their various destinations. Section 876(c) is a specific intent crime, and therefore requires a "subjective, specific intent to threaten." *United States v. Twine*, 853 F.2d 676 (9th Cir. 1988); *See also Black*, 538 U.S. at 359-60; *Bagdasarian*, 652 F.3d at 1118

(9th Cir. 2011). Havelock's statements and the circumstances surrounding the mailing of the copies of his Manifesto clearly demonstrate that he intended them to be read after his imagined rampage had occurred and he was deceased.

Among the evidence that Havelock intended his writings to be received after his demise was a letter mailed to the Office of Personnel Management at the same time as the media packets, in which he stated "[b]y the time this letter reaches you, I will probably be deceased or no longer able to sign any further needed paperwork," and directed them to transfer his retirement funds to the mother of his children. Consistent with his later statement that he planned to commit "suicide by cop," Havelock had with him in his car a letter to the police on which he had handwritten the command "DO NOT RESUSCITATE." In a letter mailed to his parents, he asked that his body be cremated and hoped that his "tragic end" would be eye opening as he planned to "go onto [sic] a better place." Indeed, the Manifesto itself states near its conclusion: "I'm going to talk to God." These and other statements clearly demonstrate that Havelock did not intend to survive the events of Superbowl Sunday, and any unlawful acts referred to in the letters sent on that day were not intended to put its recipients in fear of future actions on his part. Nor, in context of when they were received, could they have done so. In addition to the sheer impossibility that a Manifesto received *after* Superbowl Sunday could instill in its recipients a fear of harm that would result from events that would already have occurred, or could no longer occur, the lack of any intent to cause an apprehension of future harm—shown from both words and context—precludes a finding that the Manifesto was, in fact, a threat.

For the reasons explained above, I would hold that the Manifesto did not contain a threat and would on that ground reverse Havelock's conviction for violating 18 U.S.C. § 876(c).

## II

Returning to the ground on which the majority decides to reverse Havelock's conviction, I start with the language of the statute.

> Whoever knowingly so deposits or causes to be delivered as aforesaid, any communication . . . *addressed to* any other person and *containing* any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 876(c) (emphasis added).

The "as aforesaid" refers to subsection (a), which states "[w]hoever knowingly deposits in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service or knowingly causes to be delivered by the Postal Service according to the direction thereon." § 876(a). The subsection at issue here explicitly punishes the mailing of any threatening communication in the prescribed manner if it is "addressed to any other person," *and* "contain[s] any threat" to a person. § 876(c).

The language of the statute unmistakably distinguishes between the addressee portion of the communication and the communication's content. The majority initially recognizes appropriately that "person," in both sections of the statute, must be a natural person. However, by subsequently concluding that a court may look to the content of the communication to determine whom it is "addressed to" the majority renders its holding without substance and effectively excises the "addressed to" requirement from the statute. Under the majority's interpretation, the "addressed to" element becomes superfluous because once a threat to a person is identified within the content of the letter the communication will necessarily con-

tain a subject or object of the threat, and that subject or object will necessarily become the addressee of the communication. If there is no such subject or object of the threat, then whether or not there is an addressee of the communication who is a natural person is irrelevant because the communication fails to violate the statute due to the absence of a threat. Indeed, in the instant case the majority holds that there is no addressee because it fails to identify a target of any threat within Havelock's rambling Manifesto, and without such a target there can be no threat. Thus, the significant number of pages that the majority devotes to explaining why § 876(c) is applicable only when the addressee is a natural person is of no significance under its rule that the identity of that natural person may be located anywhere within the body of the communication. Either there is such a person identified in the body of the communication and there is both an addressee and a threat, or there is no person so identified and thus no addressee and no threat. By failing to preserve the statutory distinction between the two elements, the addressee and the contents of the communication, the majority has re-written the statute, eliminating one of the two necessary elements.

The majority begins its analysis by recognizing two potential definitions of the term "address." Neither definition supports the majority's ultimate reading of the statute, but even the broader definition of "to address," meaning "to speak, write, or otherwise communicate directly to," Maj. Op. at 46, does not control the question of who is the addressee of a letter deposited in the mail. Section 876, adopted in 1932, shortly after the kidnapping of the Lindbergh baby, is a statute that punishes individuals who mail various forms of threatening communications addressed to identifiable persons by means of the postal system. In subsection (a), the statute clearly details the mailing requirements that are necessary to bring a communication under the province of the statute. These requirements are incorporated into all of the subsequent subsections. The issue here involves the meaning of the statutory use of the word "addressee," which is a term used to des-

ignate the person to whom the Post Office is to deliver an envelope mailed through its system. Keeping in mind that this is a statute intended to punish the sending of certain communications through the postal system, the only reasonable interpretation of the term "addressee" is the party named on the outer envelope to whom the Post Office would deliver a communication that has been mailed pursuant to the terms described within the statute. Even if the court were permitted to look beyond the outer envelope to the salutation line of a communication to determine the addressee, that would clearly be the outer limit under any definition of the words of the statute. To go further, as the majority does here, and to examine the entire contents of the communication, in order to seek the identities of those who may be the potential targets of the threatening communication and to label them the addressees, distorts the language of the statute beyond its plain meaning and intention as well as eliminates the first of its two requirements, that there be an addressee as well as a threat to injure any person.

By the majority's own definition, to "address" a letter to someone means to "communicate directly to" that individual. One may "communicate directly to" another through the mail by placing the intended recipient's name and address on the outer envelope and causing the post office to deliver that letter to the person so identified. One may arguably in some limited circumstances, even mail a letter to a corporate entity or the office of an official and designate a natural person as the intended recipient in the salutation line, although I need not decide that question here. Either of these methods may *conceivably* be viewed as a valid attempt to "communicate directly to" another person through the mail. In any ordinary usage of the term, however, one would not be understood as having "communicated directly to" some individual whose name is mentioned or discussed only within the body of a document that is formally addressed to another — or addressed to no one at all. One fails to "communicate directly to" another person when one mails a letter to an artificial

entity, fails to address that person in the salutation, and mentions his name only in the body of the letter as an individual whom one intends to harm. This manner of communication is by no means "direct" and any individual identified only by examining the contents of such a communication cannot be referred to as the "addressee." An individual so identified may be the object of the threat; he may be the subject of the threat; but an individual not intended to be the recipient of the letter cannot, in any way, be termed the *addressee* of the communication. That person may properly be understood to satisfy the second element of the statute, but he cannot satisfy the first.[2]

To assist it in arriving at its untenable conclusion that the addressee may be contained in the body of the letter, the majority selectively adopts the Fourth Circuit's reasoning in *United States v. Rendelman*, 641 F.3d 36 (4th Cir. 2011). In *Rendelman*, the court considered whether the sending of two letters, whose outer envelopes were each addressed to the U.S. Marshals Service and which contained a threat to harm the President of the United States, was a punishable act under § 876(c) and subject to the ten year enhancement as a "communication addressed to an official covered by 18 U.S.C. § 1114."[3] *Id.* The *Rendelman* court recognized that the defen-

---

[2]The statute contemplates the possibility that a communication may be addressed to one person and contain a threat to another by criminalizing threats to "injure the person of the addressee *or of another*." § 876(c). It is therefore not necessary that the subject or object of the threat also be the addressee of the communication, although if they were one and the same the conduct would be penalized in the same manner. The threat may be directed to the addressee or to another, but in either case the communication itself must be delivered through the mail to a natural person who is the addressee. It is necessary under the clear language of the statute that the communication contain the name of an addressee to whom it is mailed through the postal system *as well as* a threat to a person, and we cannot merely satisfy ourselves, as the majority does, with the presence of the latter element and not the former.

[3]Section 1114 specifically identifies "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services)." 18 U.S.C. § 1114.

dant's letters were "addressed to" the Marshals Service, because they specified the Marshals Service on the outer envelope. The court concluded that the defendant's mailings satisfied the "person" requirement of § 876(c) by holding that a communication addressed to the Marshals Service "can reasonably be understood as addressed to the United States Marshal himself — a natural person." *Id.* at 46. While we need not adopt the Fourth Circuit's conclusion as to the natural person status of the Marshals Service, it is plain that the court identified a "person" as the addressee based on the name supplied on the outer envelopes of the charged communications, and that it did not identify the addressee through investigating the contents of the mailing itself. This holding, therefore, does not provide support for the majority's conclusion that it may scour the contents of a communication to identify the natural person to whom it is addressed.

After holding that the Marshals Service satisfied the statutory requirement that the addressee be a "person," the Fourth Circuit went on to consider an entirely different subject: the question of enhancement. It held that the defendant was subject to enhanced penalties because "the threat contained in the . . . [l]etter was sufficiently alleged as being 'addressed to', i.e., 'directed to,' the President . . . even though the letter was not mailed to [him]." *Id.* at 47.[4] The majority relies on this

---

[4]This statement in *Rendelman*, as well as its holding on the enhancement element, was achieved through a disingenuous substitution of statutory language. Section 876(c) explicitly requires that the *communication* not the *threat* be addressed to a person. By substituting one term — *threat* — for another — *communication* — the *Rendelman* court partially altered the meaning of the statute and eliminated, for purposes of enhancement, the need for an addressee that would satisfy the requirement that the communication be addressed to an official covered by § 1114. The *Rendelman* court bifurcated the statute as it relates to the enhancement element by contending that the second use of the phrase "addressed to" in § 876(c) means something different than the first. This is plainly inconsistent with the language and structure of the statute, in which the requisite manner of mailing is fully articulated only once, in § 876(a), and then incorporated

statement to support its conclusion that a court may look to the contents of a communication to identify an addressee. What the *Rendelman* court identified within the text of the defendant's letters, however, was the *object of the threat*, not the addressee of the communication. It is of course necessary to look to the content of the communication to find if the communication contains a threat, and if so, to whom or to what that threat is directed.[5] We are not limited to the outside

by reference in the subsequent sections. In practical terms, read properly, the statute provides for an enhancement if the letter containing the threat is addressed to a designated official and contains a threat to any person. As *Rendelman* reads the enhancement provision, it applies if the letter is addressed to any person but the threat contained in the letter is made to a designated official. All of this is irrelevant, however, as the Fourth Circuit held in the part of its opinion deciding when a statutory offense is committed that an addressee is a person who could be identified by the name on the outside of the envelope. That is directly contrary to the proposition for which the majority cites the case.

[5]It is important to note that § 876(c) and (d) provide for enhanced punishment based on the addressee of the communication, not the target of the threat. As a result, a perpetrator could have his punishment enhanced for addressing a letter to a federal judge threatening to harm the judge or the judge's family, but would not receive an enhancement if he addressed a letter to the judge's family and threatened to harm the judge. This result may seem anomalous, and may even tempt a court, such as the Fourth Circuit, to substitute the term "threat" for "addressee" in order to achieve a result it believes better reflects the types of harms it feels merit greater punishment. The punishment structure of the statute makes complete sense, however, if we accept that Congress may have been more concerned with the harm that would result from judges or other federal officials being unduly influenced by threats to their loved ones (or to themselves) than it was with the possibility that those unaffiliated with the operation of the federal government may receive threatening communications that expressed an intent to harm a federal official. Moreover, when Congress was concerned with threats of certain types of harm inflicted against certain categories of people, it explicitly identified such threats. *See, e.g.,* § 876(d). Therefore, when Congress failed to impose punishment based on the nature of the threat we must assume that it meant what it wrote and intended punishment based on the addressee rather than the object of the threat.

of the envelope or the salutation line of the letter to determine if there is a threat, and a threat to a person "contained" in a communication can certainly be found only in the content of the communication. This truism is of no relevance, however, to the majority's conclusion that it may explore the contents of the communication in search of the *addressee* of the communication in which the threat is contained. In contrast to the majority's decision, the *Rendelman* court looked to the content of the communication to identify the object of the sender's threat, not the identity of the addressee of the communication. The majority selectively invokes the language of the *Rendelman* decision to assist it in reaching its desired conclusion, but *Rendelman*, to the extent that the court interpreted the portion of § 876(c) that is at issue in this case, simply does not support the majority's holding.[6]

The majority opinion also cites *Rendelman* as support for its conclusion that the contents of a letter are fair game in determining who the writing is "addressed to" because "[a]t its essence, § 876(c) criminalizes the use of the postal system

---

[6]The majority also cites to *United States v. Williams*, 376 F.3d 1048 (10th Cir. 2004), for its conclusion that you may look to the contents of a letter to identify the addressee, but this reliance is also in error. In *Williams*, the Tenth Circuit held that one may look to the salutation line as well as the envelope to identify the addressee, a question I would leave open here. The Tenth Circuit, as cited by the majority, Maj. Op. 47-48, went on to state the uncontested fact that "[t]he word 'communication' includes the contents of a letter." This statement of fact does not at all speak to the propriety of looking to the contents of a letter to identify the addressee, and cannot reasonably be used to support the majority's ultimate conclusion that an addressee may be located anywhere within the pages of the communication. The Second Circuit in *United States v. Davila*, 461 F.3d 298 (2nd Cir. 2006), held the defendant's mailing punishable under § 876(c), but in doing so, the court looked only to its outer envelope to identify the addressee. Therefore, despite the majority's citations to other circuits that have purportedly adopted the same "common-sense" understanding that we may look to the contents of the communication to identify an addressee, the Ninth Circuit now stands alone in so holding.

to deliver a threatening communication." Maj. Op. at 49 (quoting *Rendelman*, 641 F.3d at 48). Unfortunately we are not asked to divine a statute's essence but to interpret its text. The text of § 876(c) does not merely criminalize the use of the United States Postal Service to deliver threatening communications, but requires that such communications be deposited in the mail "addressed to any other person" (other than the sender) before such acts are subject to criminal penalties. § 876(c). In Section II.A of its opinion the majority appears to recognize this, but in Section II.B, perhaps for practical reasons at which we are left to guess, it goes off on an entirely different tack. The erroneous reading of the statute offered by the majority in Section II.B allows for the criminalization of a wider array of bad acts consistent with their view of what the statute *should* have achieved, but their reading is well beyond the scope of conduct that is *actually* circumscribed by the statutory text.

In its awkward attempt to explain the "true meaning" of the statute, the majority violates the "cardinal principle of statutory construction . . . to give effect, if possible, to every clause and word of a statute," *United States v. Menasche*, 75 S. Ct. 513, 520 (1955) (internal quotations and citations omitted). *See also Duncan v. Walker* 121 S. Ct. 2120, 2125 (2001). The *Rendelman* court and today's majority choose to ignore this axiom because it does not square with their own view as to how the statute should have been written. Once they have deemed its true purpose to be to punish the use of the postal system for the delivery of all threatening communications, any reading of the statute that falls short of this purpose is unacceptable. In subverting the language of the statute to meet the ends it desires, the majority ignores not only the command that we give all words meaning, but also the central principle in the interpretation of penal statutes that requires us to interpret criminal laws narrowly. *See Regents of Univ. of California v. Public Emp't Relations Bd.*, 485 U.S. 589, 604 (1988) (Stevens, J., dissenting); *United States v. Bass*, 404 U.S. 336, 347-48 (1971). Today's opinion violates both commands by

ignoring the statutory language and re-writing the statute to encompass a broader range of conduct than is criminalized under the clear language of the statute. If the majority had grounded its analysis on the recognition that "[w]e are not at liberty to rewrite the statute to reflect a meaning we deem more desirable . . . . [but rather] must give effect to the text [C]ongress enacted," *Ali v. Fed. Bureau of Prisons*, 128 S. Ct. 831, 841(2008), it would have given the "addressed to" element the meaning it deserves.

For the above reasons I concur in part and dissent in part with the majority opinion; but concur only because a majority of this en banc court fails to adopt what I believe to be the preferable ground for reversing Havelock's conviction.

---

WARDLAW, Circuit Judge, concurring in part and dissenting in part:

The district court denied Havelock's Rule 29 motion for acquittal, which incorporated the statutory and constitutional arguments underlying his earlier motion to dismiss the indictment. The district court first ruled that to violate 18 U.S.C. § 876(c), the communication must be addressed to a natural person; but to decide that question, the finder of fact may look to the contents of the communication. Second, the district court found that Havelock's communications were addressed to the public, a group of natural persons. Third, it concluded that there was sufficient evidence of a "true threat" under *Virginia v. Black*, 538 U.S. 343 (2003), to sustain Havelock's conviction. The panel majority reverses the district court on the ground that Havelock's threat was not addressed to natural persons.

I agree with the panel majority that to violate § 876(c) the defendant must address the communication to a natural person, and that the finder of fact may look to the content of the

communication. However, I conclude that Havelock's communications were addressed to natural persons, as the district court found, but that they were not threats, much less "true threats," as the district court permitted the jury to find.

By focusing on the identity of the individual addressees threatened by the Manifesto, the majority conflates the issue of whether the communications were addressed to natural persons with the question of whether Havelock's communications were threatening as a matter of law. Havelock deposited self-described "media packets," addressed to media outlets, in a mailbox on Super Bowl Sunday, with the expectation that the envelopes would be delivered following his shooting spree and death. The envelopes bore no names of individuals, but instead were directed to the New York Times, the Los Angeles Times, the Phoenix New Times and the Associated Press. Nonetheless, Havelock certainly intended that natural persons at the named media outlets would open them and ultimately publicize his irrational rationale for the planned "econo-political confrontation" at Super Bowl XLII after it occurred. While we do not even need to examine the contents of the communications to determine that they were addressed to "persons," I agree with the majority that in considering whether the person addressed is a natural person, a court may examine the contents of the communication.

A few examples illustrate this point. Suppose the address on the envelope is:

> The White House
> 1600 Pennsylvania Avenue N.W.
> Washington, D.C. 20500

Inside is a communication addressed to the United States President that threatens to kidnap the President's mother-in-law. This threat, deposited in a mailbox and delivered by the Postal Service to the White House, would certainly be punishable under § 876(c). Even if the contents of the communica-

tion were not addressed to the President, but threatened that the President's mother-in-law would be kidnapped and held hostage unless the President took some action, we would find the threat prohibited by § 876(c). Similarly, a letter mailed to

> One First Street NE
> Washington, D.C. 20543

containing a conditional threat of harm to a Justice of the United States Supreme Court would be criminalized by § 876(c). In both of these examples, although only the address, and not the name of an individual, is written on the outside of the envelope, the contents reveal that a natural person is the addressee. Similarly, suppose an envelope deposited in the mail is addressed:

> North Polar — Santa Claus
> P.O. Box 56099
> North Pole, AK 99705-1099

The contents of the missive threaten that unless the workers at North Polar stop answering children's letters to Santa, giving them the false hope of a Christmas bounty, their office will be blown up, injuring all of them. Are the workers any less persons to whom a threat is addressed because they are not individually identified on the envelope that carried the threat? A person threatening harm through the Postal Service should not be able to evade § 876(c) by simply failing to place the name of the threatened individual above the address to which it is mailed.

Although, like Judge Fisher, I would conclude that Havelock's communications were addressed to natural persons, I would reverse the district court's denial of the motion for acquittal because there was insufficient evidence of a "true threat" to sustain the verdict. In *Virginia v. Black*, the Supreme Court held that the State may punish threatening expression only if the "speaker means to communicate a seri-

ous expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359 (2003). "Because the true threat requirement is imposed by the Constitution, the subjective test set forth in *Black* must be read into all threat statutes that criminalize pure speech." *United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011). Moreover, as a matter of statutory construction, as the district court correctly instructed the jury, § 876(c) requires specific intent to threaten. *See United States v. Twine*, 853 F.2d 676, 680 (9th Cir. 1988) ("Today we hold that the showing of an intent to threaten, required by §§ 875(c) and 876, is a showing of specific intent."). Thus, "to 'determine whether the verdict [under the statutory elements] is supported by sufficient evidence,' we must answer the question 'whether the facts as found by the jury establish the core constitutional fact of a 'true threat.'" *Bagdasarian*, 652 F.3d at 1118 (alterations in original) (quoting *United States v. Stewart*, 420 F.3d 1007, 1015 (9th Cir. 2005)).

Havelock's communications did not "contain a threat" to the public, as Judge Reinhardt's concurrence ably demonstrates. "'Whether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.'" *Planned Parenthood of the Columbia/Williamette, Inc. v. Am. Coal. of Life Activists,* 290 F.3d 1058, 1074 (9th Cir. 2002) (en banc) (quoting *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990)). Here, because Havelock deposited his communications in the mail on a Sunday, he ensured that they would not be received until after the only possible threatened action had occurred. Nor could Havelock have meant "to communicate a serious expression of an intent to commit an unlawful act of violence," *Black*, 538 U.S. at 359, because the communications clearly evidence his intent to commit suicide before his statements were received by anyone. In short, "threats" portend

future—not past—action. Havelock's statement to his fiancée following his change of heart that "he threatened a lot of people in the letters" is not evidence that meets the statutory or constitutional requirements of a "true threat," and the district court erred as a matter of law in concluding that the evidence was sufficient to support a finding of subjective, specific intent.

In many ways, § 876(c) is anachronistic. It was enacted at a time when deposit of "mail matter" for delivery by the Postal Service was the primary means of written communication and one's address was the place where a person received mail. Today, the Postal Service is in serious decline, and true threats are more likely to be emailed, texted, or posted on the Internet. *See Bagdasarian*, 652 F.3d at 1126-27 (Wardlaw, J., concurring in part, and dissenting in part) (collecting instances of online threats and postings that presaged tragic events). Havelock's choice to use snail mail, particularly on a Sunday, thirty minutes before the Super Bowl where he intended to shoot attendees and commit "suicide by cop," guaranteed that by the time anyone actually received the communication, the deed would be done—not merely threatened.

FISHER, Circuit Judge, with whom JOHNNIE B. RAWLINSON, Circuit Judge, joins, dissenting:

I respectfully dissent. Although I agree with the majority that we may look to the contents of a communication to determine to whom it is addressed, I disagree with the majority that Havelock's communications were not "addressed to any other person." 18 U.S.C. § 876(c).

As an initial matter, I have some doubts regarding the majority's conclusion that § 876(c) applies only to communications addressed to *natural* persons. Although there is some reason to reach that conclusion, the context in which the

phrase "addressed to any other person" appears, the purpose of § 876 and the importance of construing federal statutes to avoid absurd results suggest that § 876(c) may apply to communications addressed both to natural persons and, as relevant here, to corporations.

I need not resolve that question, however, because even assuming § 876(c) applies only to communications addressed to natural persons, as the majority holds, I would hold that Havelock's communications were so addressed. Havelock mailed his manifesto to media outlets such as the *New York Times*, presumably for publication. Although neither the manifesto nor the threats it contains were directed at any *specific* person, Havelock plainly intended his manifesto to be read *by the general public* — which is made up of natural persons. Unlike the majority, I see no reason to preclude liability under § 876(c) when a threatening communication is addressed to, and threatens mass murder against, a community rather than a specific individual. Here, Havelock threatened to "slay your children," to "sacrifice your children upon the alter of your excess" and to "take as many of you with me as I can." In doing so, he directed his manifesto (as well as his threats) to natural persons. I would accordingly hold that the government satisfied the "addressed to any other person" element in this case.

I.

In July 1932, Congress enacted an Act to punish the sending through the mails of certain threatening communications. *See* Act of July 8, 1932, ch. 464, 47 Stat. 649. That law provided in pertinent part:

> [W]hoever, with intent to extort from any person any money or other thing or value, shall knowingly deposit or cause to be deposited in any post office or station thereof, or in any authorized depository for mail matter, to be sent or delivered by the post-office

establishment of the United States, any written or printed letter or other communication with or without a name or designating mark subscribed thereto, addressed to any other person, and containing any threat (1) to injure the person, property, or reputation of the addressee or of another or the reputation of a deceased person, or (2) to kidnap any person, or (3) to accuse the addressee or any other person of a crime, or containing any demand or request for ransom or reward for the release of any kidnaped person, shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

*Id.*[1] Despite several amendments, the current version of the 1932 statute, now codified at 18 U.S.C. § 876, remains largely unchanged. It provides:

(a) Whoever knowingly deposits in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service or knowingly causes to be delivered by the Postal Service according to the direction thereon, any communication, with or without a name or designating mark subscribed thereto, addressed to any other person, and containing any demand or request for ransom or reward for the release of any kidnapped person, shall be fined under this title or imprisoned not more than twenty years, or both.

(b) Whoever, with intent to extort from any person any money or other thing of value, so deposits, or causes to be delivered, as aforesaid, any communica-

---

[1]This legislation may have been motivated by the March 1932 kidnapping for ransom and murder of the 18-month-old son of aviator Charles Lindbergh, which also spurred congressional passage of the Federal Kidnapping Act, *see* Act of June 22, 1932, ch. 271, 47 Stat. 326 (codified as amended at 18 U.S.C. § 1201).

tion containing any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than twenty years, or both.

(c) Whoever knowingly so deposits or causes to be delivered as aforesaid, any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both. If such a communication is addressed to a United States judge, a Federal law enforcement officer, or an official who is covered by section 1114, the individual shall be fined under this title, imprisoned not more than 10 years, or both.

(d) Whoever, with intent to extort from any person any money or other thing of value, knowingly so deposits or causes to be delivered, as aforesaid, any communication, with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to injure the property or reputation of the addressee or of another, or the reputation of a deceased person, or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both. If such a communication is addressed to a United States judge, a Federal law enforcement officer, or an official who is covered by section 1114, the individual shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 876.[2]

---

[2]Congress amended the 1932 Act in 1935, 1939, 1970, 1994 and 2002. *See* Act of June 28, 1935, ch. 326, 49 Stat. 427; Act of May 15, 1939, ch.

In 1934, Congress adopted a related statute prohibiting the transmission of threatening communications in interstate commerce. *See* Act of May 18, 1934, ch. 300, 48 Stat. 781. The 1934 law, entitled "An Act Applying the powers of the Federal Government, under the commerce clause of the Constitution, to extortion by means of telephone, telegraph, radio, oral message, or otherwise," provided as follows:

> [W]hoever, with intent to extort from any person, firm, association, or corporation any money or other thing of value, shall transmit in interstate commerce, by any means whatsoever, any threat (1) to injure the person, property, or reputation of any person, or the reputation of a deceased person, or (2) to kidnap any person, or (3) to accuse any person of a crime, or (4) containing any demand or request for a ransom or reward for the release of any kidnaped person, shall upon conviction be fined not more than $5,000 or imprisoned not more than twenty years, or both. . . . *Provided further.* That nothing herein shall amend or repeal section 338a, title 18, United States Code (47 Stat. 649) [now codified as 18 U.S.C. § 876].

*Id.* Like § 876, this 1934 law has been amended several times, but remains fundamentally unchanged from its original form.[3] Now codified at 18 U.S.C. § 875, it provides:

---

133, 53 Stat. 742; Postal Reorganization Act, Pub. L. No. 91-375, § 6(j)(7), 84 Stat. 719, 777 (1970); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, Title XXXIII, §§ 330016(1)(G), (H), (K), 330021(2), 108 Stat. 1796, 2147, 2150; Federal Judiciary Protection Act of 2002, Pub. L. No. 107-273, Div. C, Title I, § 11008(d), 116 Stat. 1818, 1818.

[3]Congress amended the 1934 Act in 1939, 1986 and 1994. *See* Act of May 15, 1939, ch. 133, 53 Stat. 742, 744; Criminal Law and Procedure Technical Amendments Act of 1986, Pub. L. No. 99-646, § 63, 100 Stat. 3592, 3614; Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, Title XXXIII, § 330016(1)(G), (H), (K), 108 Stat. 1796, 2147.

(a) Whoever transmits in interstate or foreign commerce any communication containing any demand or request for a ransom or reward for the release of any kidnapped person, shall be fined under this title or imprisoned not more than twenty years, or both.

(b) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.

(c) Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

(d) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 875.

Sections 875 and 876 are similar in many respects, and a side-by-side comparison shows that subsections (a) through (d) of the two statutes closely track one another. There are, however, some notable differences. First, whereas § 876 applies to threatening communications sent by *mail*, § 875 applies to threatening communications transmitted by any

means.[4] Second, whereas § 875 applies only to interstate communications, § 876 applies to all communications by mail, whether interstate or intrastate. Third, and as relevant here, although both statutes use the word "person" many times, § 875 on occasion employs the more specific phrase "person, firm, association, or corporation." I discuss the significance of this difference in language below.

Havelock was convicted of violating § 876(c). Section 876(c) has several elements, including: (1) the knowing use of the mails, (2) a communication, (3) "addressed to any other person" and (4) "containing any threat to kidnap any person or any threat to injure the person of the addressee or of another." 18 U.S.C. § 876(c).[5] At issue here is the third element — the requirement that a communication containing a threat be "addressed to any other person." We are asked to decide whether "person," as used in this phrase, means a "natural person" or, in accordance with the Dictionary Act, includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1 (providing the Dictionary Act definition of "person" that applies to federal statutes "unless the context indicates otherwise"). We are also asked to decide whether, assuming § 876(c) applies only to a communication addressed to a natural person, Havelock's communications were so addressed.

---

[4]Although the issue is not presented here, it appears that § 875 applies to threats transmitted by interstate mail. Here, Havelock appears to have mailed several of his communications from Arizona to entities outside of the state, including the *Los Angeles Times* and the *New York Times*. The government, however, did not charge Havelock with violating § 875(c).

[5]We have also held that § 876(c) requires the additional element of a specific intent to threaten. *See United States v. Twine*, 853 F.2d 676, 680 (9th Cir. 1988).

## II.

The first question is whether § 876(c) applies only to a communication addressed to natural persons. Because I conclude that Havelock's communications were addressed to natural persons, I need not resolve this question. Nonetheless, given that the majority reaches the issue, I write to explain why I think this is a close question, and why I have some doubts about the majority's decision not to apply the Dictionary Act definition. A strong case can be made that § 876(c) applies to a communication addressed to a corporation.

## A.

The majority concludes that the narrower definition applies because "there is a presumption that a given term is used to mean the same thing throughout a statute." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). According to the majority, the two other uses of the word person in § 876(c) refer to a natural person, so this same definition must apply to the use of the word "person" in the operative phrase "addressed to any other person."

*Brown*'s canon of construction may not apply here, however. *Brown* applies when a word is given the same meaning throughout a statute. Here, even under the majority's view § 876(c) employs at least two definitions of the word "person."

The word "person" has many meanings. Among these are:

(a)  "A living human" (i.e., a natural person),

(b)  "The living body of a human: *searched the prisoner's person*," and

(c)  "*Law* A human or organization with legal right and duties" (i.e., the Dictionary Act definition).

American Heritage Dictionary of the English Language 1310 (4th ed. 2000). Section 876(c) uses the word "person" three times:

> Whoever knowingly so deposits or causes to be delivered as aforesaid, any communication with or without a name or designating mark subscribed thereto, addressed to any other *person* and containing any threat to kidnap any *person* or any threat to injure the *person* of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 876(c) (emphasis added). I assume that no one disputes that the second use of the word "person" employs the first definition. In the phrase "kidnap any person," the word "person" must refer to "[a] living human" (i.e., a natural person), because only a natural person can be kidnapped. I also assume that no one disputes that the third use of the word "person" employs the second definition. In the phrase "injure the person of the addressee or of another," the word "person" must refer to "[t]he living body of a human." No other definition makes sense. Thus, without deciding whether the first use of the word "person" employs the first definition or the third, it is questionable whether *Brown*'s presumption — that "a given term is used to mean the same thing throughout a statute" — applies to § 876(c). The majority's reliance on *Brown* therefore appears to be misplaced.

### B.

The majority's second argument rests on more solid footing. As the majority points out, § 876(c) refers to a "threat to injure *the person of the addressee* or of another." 18 U.S.C. § 876(c) (emphasis added). This language suggests that the addressee has a person — a "living body" — that can be injured. If that is the case, then perhaps the "person" to whom a communication must be addressed must be a natural person.

This language is not dispositive, however. The highlighted phrase could also reasonably be understood to mean a "threat to injure the person of the addressee, if the addressee is a natural person, or the person of another." This language thus lends only modest support to the majority's position.

C.

The majority's analysis also relies on a comparison of §§ 875 and 876. As the majority points out, § 875 employs the word "person," standing alone, in some contexts, but uses the phrase "person, firm, association, or corporation" in others. This suggests that for purposes of § 875 Congress intended the word "person," when standing alone, to apply only to natural persons. It also shows that Congress knows how to employ the Dictionary Act definition *explicitly* when it wants to. I agree with the majority that Congress' use of "person" in § 876 and its selective use of "person, firm, association, or corporation" in § 875 supports, to a degree, the inference that Congress intended the word "person" in § 876 to apply to only natural persons.

The comparison between §§ 875 and 876, however, also cuts in the opposite direction. If the majority is correct that every use of the word "person" in § 876 refers to a natural person, then Congress drew distinctions between §§ 875 and 876 that are difficult to fathom. I glean this lesson from comparisons between §§ 875(b) and 876(b) and §§ 875(d) and 876(d). These pairs of subsections are virtually identical, except that § 875(b) and (d) apply to extortion "from any person, firm, association, or corporation," whereas § 876(b) and (d) apply to extortion "from any person." If the majority is correct, then § 875 prohibits extortion from corporations, but § 876 does not. Why would Congress have intended this result? Presumably Congress was equally concerned about extortion whether it was committed through the mail or interstate transmission. If so, then the word "person" in the phrases "intent to extort from any person," in § 876(b) and (d), likely

employs the Dictionary Act definition. And if that is the case, then the premise that the word "person" always means "natural person," when it is used in § 876, does not hold up.

D.

The majority also fails to entirely dispel the concern that its approach would produce absurd results — something we all agree we should avoid. *See In re Pac.-Atl. Trading Co.*, 64 F.3d 1292, 1303 (9th Cir. 1995) ("We will not presume Congress intended an absurd result.").

If § 876(c) applies only to a communication addressed to a natural person, then there would be no § 876 liability in the case of a communication, addressed to the *New York Times*, and containing a threat to kill the paper's executive editor. There also would be no § 876 liability if the same communication threatened to kill the news staff, or their children, or members of the public attending a concert in Central Park. It is difficult to imagine why Congress would have intended such results.[6]

The majority's approach could also produce implausible results when applied to § 876's other subsections. Section 876(a), for instance, prohibits the mailing of a communication, "addressed to any other person," and containing "any demand or request for ransom or reward for the release of any kidnapped person." 18 U.S.C. § 876(a). Under the majority's reading of "person," there would be no liability where a defendant mails to a corporation a ransom demand for the release of a person who has been kidnapped.

These results would be avoided were "person" defined in

---

[6]If these threats were mailed interstate, the sender might be liable under § 875(b), which does not have an addressee requirement. When the threats are mailed intrastate, however, the majority's approach produces a gap in the statutory scheme that I am concerned about.

accordance with the Dictionary Act. "Identical words appearing more than once in the same act, and even in the same section, may be construed differently if it appears they were used in different places with different intent." *Vanscoter v. Sullivan*, 920 F.2d 1441, 1448 (9th Cir. 1990) (citing *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). Here, Congress may have employed three distinct definitions of "person" when it enacted § 876(c) — the second use referring to natural persons, the third use referring to the living body of a human being and the first use referring to the Dictionary Act definition.

Thus, although I agree with some of the majority's analysis, a strong case can also be made § 876(c) applies to communications addressed to natural persons and corporations alike. However, even if § 876(c) applies only to communications addressed to natural persons, I would hold that Havelock's communications were so addressed. I agree with the majority that we may look beyond the outside of the envelope to the salutation line and the content of a communication to determine to whom a communication is addressed. I disagree, however, with the majority's conclusion that Havelock's communications were not addressed to natural persons.

## III.

I would hold that Havelock's communications were addressed to natural persons for two distinct reasons. First, as Judge Graber explained in her panel dissent, Havelock must have intended his manifesto to be read by employees at the media outlets to which he sent the manifesto. Mail must be read by human beings, so Havelock's communications were implicitly addressed to the media outlet employees who would have opened and read his mailings. *See United States v. Havelock*, 619 F.3d 1091, 1101 (9th Cir. 2010) (Graber, J., dissenting) ("I would hold that communications mailed to the *New York Times*, the *Los Angeles Times*, the *Phoenix New Times*, the Associated Press, theshizz.org, and azpunk.com

. . . [we]re implicitly addressed to the natural person who necessarily will open and read them.").

Second, Havelock addressed his manifesto to the general public, who, of course, are natural persons.[7] This is evident from the nature of the communications and his choice of recipients. Havelock mailed the manifesto to media outlets, plainly intending for it to be published. The manifesto uses language such as "you" and "your," making clear that he intended it to be read by the public. It says, for example, that Havelock would "go down fighting and take as many of *you* with me as I can" (emphasis added). It says, "I can get an axe or a sword from the Knife Shop in the mall. I can get a machete or a chainsaw at Home Depot. I can get a dozen knives from any dollar store. If I'm going to kill, there's nothing anyone can do to stop me." He wrote, "I have the confidence to do what must be done. . . . More will come. And it will not just be scared little school children. . . . And *you* cannot stop it. Change *your* world before we change it for *you*" (emphasis added). He wrote, "I will reciprocate in kind. . . . It will be swift, and bloody. I will sacrifice *your* children upon the altar of *your* excess. . . . I must go out and fight" (emphasis added). Saying he could "outgun" his enemies for a "brief moment," he said he would "make the ultimate sacrifice; I will give my life. And I will take as many of the baneful and ruinous ones with me. . . . I will slay *your* children. I will shed the blood of the innocent" (emphasis added). Havelock directed the messages in the manifesto, including both its political messages and its threats, to members of the public, who he hoped would read the manifesto following its publication by the media outlets he sent it to.

---

[7]To "address" means "To speak to," "To make a formal speech to," or "To direct (a spoken or written message) to the attention of." American Heritage Dictionary of the English Language 20 (4th ed. 2000). I rely on the third definition here, and conclude that Havelock directed the written messages in his manifesto to members of the public who he intended to read it.

Disagreeing, the majority concludes that Havelock's manifesto was not addressed to natural persons because it indicates nothing about the identity of any individual person to whom the communication supposedly was addressed. Unlike the majority, however, I can find nothing in § 876(c) that precludes liability when a threatening communication is addressed to, and threatens mass murder against, a community rather than a specific individual. I also can think of no reason why Congress would not have been concerned about threats to commit mass murder. I would therefore hold that Havelock's communications were addressed to natural persons.

Accordingly, I respectfully dissent.