**Levi M. RUFFIN, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 12–CF–596.**

District of Columbia Court of Appeals.

Argued Nov. 29, 2012.

Decided Sept. 5, 2013.

Alec Karakatsanis, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the briefs, for appellant.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Mary B. McCord and Magdalena Acevedo, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and NEBEKER, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

Following a jury trial, appellant Levi M. Ruffin was convicted of one misdemeanor count of assaulting, resisting, or interfering with a police officer ("APO"), and two counts of felony threats arising from statements he directed at a Metropolitan Police Department ("MPD") vehicle and a police officer.[1] In addition, although appellant was acquitted of the burglary count, the trial judge imposed a consecutive sentence of twelve months for committing a burglary while on release.[2] On appeal, he argues that: (1) there was insufficient evidence to support his APO conviction; (2) the felony

---

1. In violation of D.C.Code § 22–405(b) (2009 Supp.) and D.C.Code § 22–1810 (2001), respectively.

2. In violation of D.C.Code § 23–1328(a)(1) (2001).

threats statute is inapplicable to threats made to property owned by the District of Columbia; (3) the imposition of an additional sentence for commission of a burglary while on release was illegal; and (4) the trial court committed plain error by failing to give the jury adequate guidance on the legal requirements of the APO statute. We agree with the first three contentions raised by appellant. Consequently, the jury instruction issue is rendered moot.[3] Accordingly, we reverse appellant's convictions for APO, committing a burglary while on release, and making a felony threat to damage property owned by the District of Columbia.

## I. Factual Background

On June 12, 2010, at approximately 5:00 a.m., JaNai Humphrey was awoken by a noise in the backroom of her apartment. She looked through an internal window to investigate, noticed that the blinds were askew, and saw a portion of a person's arm. She left her apartment and went to a neighbor's apartment upstairs, where she immediately called the police. MPD Officer Carlos Amaya arrived approximately four minutes later. At that point, Ms. Humphrey advised Officer Amaya that someone was breaking into the back of her apartment. Officer Amaya walked to the back of the building to investigate.[4]

As Officer Amaya entered the alley behind the building, he saw appellant hopping over a short retaining wall. Officer Amaya observed no one else in the alley.

Although he was walking in Officer Amaya's direction, appellant was looking over his shoulder, towards a police car entering the alley behind the building. Consequently, appellant did not see Officer Amaya approach and, according to Office Amaya, appellant seemed "surprised" and "startled" when he turned and saw Officer Amaya, who was wearing his full police uniform. Officer James Wells, who observed the encounter from his patrol car, testified that appellant "didn't see [Officer Amaya] ... he just kind of bumped into him and it appeared he was trying to pull away from Officer Amaya." Officer Amaya testified that, at that point, without saying anything to appellant: "I went to ... put my hands on [appellant], and he— my hand hit his shoulder and he brushes his shoulder off my hand." Officer Amaya further described appellant's reaction as "elbowing to the back with his right arm." Then, according to Officer Amaya, he grabbed appellant and appellant became "a little combative," which prompted Officer Wells to assist Officer Amaya in handcuffing appellant. Officer Amaya did not explain what he meant by "combative."

Officer Amaya later observed Officers Wells and Pena, who had also responded to the call, attempt to place appellant in a police vehicle to transport him to the police station. The police vehicle was assigned to Officer Pena. However, appellant became "very agitated." When Officer Wells told Officer Pena that they should put appellant in the police vehicle, appellant said:

3. In a D.C.App. R. 28(k) letter dated August 23, 2013, appellant's counsel referred the court to our recent decision in *Cave v. United States*, 75 A.3d 145 (D.C. 2013). Counsel contends that *Cave*'s holding pertains directly to the jury instruction issue because it illustrates how our legal definition of "resisting" differs from the ordinary understanding of the term. However, as we have stated above, we need not decide the jury instruction issue because we reverse appellant's APO conviction on sufficiency grounds. That being said,

since the holding in *Cave* supports our decision to reverse appellant's APO conviction, we briefly address that decision. *See infra* note 9.

4. At trial, Officer Amaya testified that it was "not so dark" outside. Conversely, before the Grand Jury, Officer Amaya testified that it was "real dark outside" The parties stipulated that on the morning of June 12, 2010, sunrise did not occur until 5:42 a.m.—almost forty-five minutes after the incident.

"You put me in the car and I'm going to kick the windows out." As a result, the officers on scene decided to transport appellant to the station in a police wagon instead. Once in the wagon, appellant began screaming and kicking the walls and floor. Officer Amaya testified that when he opened the wagon door, appellant informed him that "if I came in there ... he was going to kick my [expletive]."

Appellant was charged with five counts arising from the incident: (1) first-degree burglary; (2) threatening to injure a person (Officer Amaya); (3) threatening to damage property (the police vehicle); (4) misdemeanor assaulting, resisting, or interfering with a police officer; and (5) commission of an offense while on release.[5] In response to appellant's motion to sever the fifth count, the motion judge determined that the first four counts would be tried together and the jury would hear evidence on the fifth count, if necessary, at a separate hearing.

A jury trial began on September 23, 2010. The jury acquitted appellant of burglary and convicted appellant of threatening to damage the police vehicle, threatening to injure Officer Amaya, and APO with respect to Officer Amaya. On January 12, 2011, the trial judge sentenced appellant to twenty-four months for each of the two felony threat counts to run concurrently and a consecutive six-month sentence for the APO count. Despite acknowledging that the jury acquitted appellant of the burglary count, the trial judge also imposed a consecutive sentence of twelve months for commission of a burglary while on release. This timely appeal followed.

## II. The APO Conviction

 We first consider whether there was sufficient evidence to support appellant's APO conviction. "In a sufficiency challenge we view the evidence in the light most favorable to the government, draw all reasonable inferences in the government's favor, and defer to the factfinder's credibility determinations." *In re J.S.*, 19 A.3d 328, 330 (D.C.2011) (citation and internal quotation marks omitted). The APO statute provides in pertinent part:

Whoever without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor and, upon conviction, shall be imprisoned not more than 180 days or fined not more than $1,000, or both.

D.C.Code § 22-405(b). "These acts are stated in the disjunctive, and a finding that a defendant committed any one of them would support a finding of guilt under the statute." *J.S., supra,* 19 A.3d at 330–31 (citation and internal quotation marks omitted).

Here, the government argues that by "using his elbow to brush Officer Amaya's hand from appellant's shoulder,"[6] appellant "resisted" Officer Amaya in violation of the APO statute.[7] We underscore that the conduct upon which the government

---

5. The fifth count of the indictment specified that the offense committed while on release was burglary.

6. In its brief, the government does not argue that Officer Amaya's testimony that appellant became "a little bit combative" after Officer Amaya grabbed him was a basis for the APO conviction. Rather, the government urges us to consider this testimony, as well as evidence of appellant's attempts to kick the police officers as he was being led to the police wagon and his behavior in the van, "in determining whether appellant's reaction to Officer Amaya was a 'mere reflex' as appellant contends in this appeal, or a more calculated effort to assault, resist, oppose, impede, intimidate or interfere with the police."

7. Although the government's brief also classifies appellant's arm movement as an act of "intimidating" Officer Amaya, it did not offer

has predicated this charge is strictly limited to appellant's discrete act of immediately pulling his arm away from Officer Amaya when Officer Amaya reached towards appellant's shoulder in the alley. The government does not argue—and we do not consider—whether appellant's subsequent conduct was tantamount to APO. Appellant contends that the evidence was insufficient to prove beyond a reasonable doubt that he resisted Officer Amaya because there was no evidence establishing either that appellant knew that Officer Amaya was a police officer or that appellant's act of pulling away from Officer Amaya was anything other than a "mere reflex." For the following reasons, we are persuaded by appellant's latter argument.

■■■■ "[D]espite its breadth, 'the District's APO statute does not criminalize every refusal to submit to a police officer or every prevention or hindrance of an officer in his duties.'" *Id.* at 331 (quoting *Coghill v. United States*, 982 A.2d 802, 807 (D.C.2009)). To constitute "resisting" a police officer, "'a person's conduct must go beyond speech and mere passive resistance or avoidance, and cross the line into active confrontation, obstruction or other action directed against an officer's performance in the line of duty' by 'actively interposing some obstacle that precluded the officer from questioning him or attempting to arrest him.'" *Id.* (quoting *In re C.L.D.*, 739 A.2d 353, 357–58 (D.C. 1999)). As "the statute was intended to 'deescalate the potential for violence which

exists whenever a police officer encounters an individual in the line of duty,' ... 'the key to establishing any violation of the APO statute is the active and oppositional nature of the conduct for the purpose of thwarting a police officer in his or her duties.'" *Coghill, supra,* 982 A.2d at 806 (quoting *Dolson v. United States,* 948 A.2d 1193, 1202 (D.C.2008)).

The government argues that appellant's elbow motion was comparable to the conduct of the appellants in *J.S., Coghill,* and *Dolson.* In *J.S.,* the officers chased J.S. until he slipped and fell onto the ground where the officers grabbed his arms, but he continued to resist by hiding his hands and "broke free from [the officer's] grip twice by swinging his arm forward." 19 A.3d at 329. Although J.S. argued at trial that he moved his arms away because the officers were hurting his arm, we concluded that J.S.'s actions amounted to "active and oppositional conduct" barred by the statute. *Id.* at 331–32. Similarly, in *Coghill,* co-defendant Shannon Marshall fled from police and was found lying on the ground in a grove of trees, with his arms concealed under his body. 982 A.2d at 805. Marshall refused to comply with an officer's repeated orders to show his hand and resisted the officer's attempt to handcuff him. *Id.* There, we concluded that a jury could have properly convicted Marshall of APO because he "resisted [the officer's] attempt to handcuff him, causing the officer to struggle to access his arms in order to secure the handcuffs."[8] *Id.* Fi-

---

any explanation as to how appellant intimidated Officer Amaya, and has thus abandoned this claim. *See Stewart v. United States,* 37 A.3d 870, 877 (D.C.2012) (noting that the principle which provides that "points not urged on appeal are deemed to be waived" applies to the government, as well as the defense (citation and internal quotation marks omitted)). Accordingly, our analysis is limited to whether there was sufficient evidence to prove that appellant violated the APO statute by "resisting" Officer Amaya.

8. However, in light of our holding that flight is not "active conduct directed at the officers," we reversed Marhsall's APO conviction because the trial judge gave no limiting instruction in response to the jury's note asking whether Marshall's flight could be considered the *sole* basis of his APO conviction. *Coghill, supra,* 982 A.2d at 808. We also considered the validity of co-defendant Coghill's APO conviction and concluded that his conduct, which involved abruptly leaning back in the driver's seat, shifting the parked vehicle into

nally, in *Dolson,* Dolson closed a gate and held it closed in an attempt to prevent the officer from entering his apartment. 948 A.2d at 1195. The court found that this was an "interference" with the police and not mere "passive resistance or avoidance." *Id.* at 1202–03.

▮ In all three cases, the defendants were clearly aware that the police intended to apprehend them and their deliberate acts of physical resistance exceeded a single motion. The evidence in *J.S., Coghill,* and *Dolson* established that each defendant actively sought to avoid police efforts to restrain them. Conversely, here, the government's evidence established that appellant was "surprised" and "startled" by Officer Amaya's presence immediately in front of him, and that Officer Amaya had not identified himself before reaching for appellant's shoulder. Then, according to Officer Amaya's testimony, appellant instantaneously "brushed his shoulder" away from Officer Amaya's hand. Such an isolated motion is not conduct that rises to the level of "active and oppositional conduct." *Coghill, supra,* 982 A.2d at 806. As noted above, the "APO statute does not criminalize every refusal to submit to a police officer or every prevention or hindrance of an officer in his duties." *J.S., supra,* 19 A.3d at 331 (citation and internal quotation marks omitted). We therefore hold, as a matter of law, that appellant's ephemeral elbow jerk in response to a police officer reaching towards his shoul-

der did not amount to "resisting" a police officer. Accordingly, even when viewed in the light most favorable to the government, this evidence cannot establish that appellant resisted a police officer.[9]

## III. The Felony Threats Statute

We next consider whether the felony threats statute, D.C.Code § 22–1810, prohibits threats to destroy property owned by the District of Columbia. This is a matter of first impression. The statute is entitled "Threatening to kidnap or injure a person or damage his property" and provided in its entirety at the time of these offenses:

> Whoever threatens within the District of Columbia to kidnap any person or to injure the person of another or physically damage the property of any person or of another person, in whole or in part, shall be fined not more than $5,000 or imprisoned not more than 20 years, or both.

*Id.* Appellant argues that the terms of this statute only apply to property belonging to natural persons and therefore do not criminalize the conduct for which he was convicted, i.e., his statement while being restrained by officers outside of a MPD vehicle that: "You put me in there, I'm going to kick out the windows." The government responds that the use of "person" in the felony threats statute encompasses the District of Columbia due to its legal status as a municipal corporation. *See*

---

gear, and bracing his arms against the steering wheel to prevent being removed from the vehicle by several officers who sought to pat him down, was "precisely the type of escalating conduct that increases the likelihood of violence during police encounters and that the [APO] statute was designed to prevent." *Id.* at 806.

9. Our recent holding in *Cave* lends support to our decision to reverse appellant's APO conviction. In *Cave,* we reversed Cave's APO conviction because the government conceded,

and we agreed, that an individual cannot be convicted of APO for resisting a police officer because of a simple refusal of an officer's request to exit his or her vehicle. 75 A.3d at 146. In doing so, we reiterated that in order for an individual's conduct to constitute "resistance" under the APO statute, it must be "*active* confrontation, obstruction or other action directed against an officer's performance in the line of duty" rather than "mere passive resistance or avoidance." *Id.* (emphasis added) (citation and internal quotation marks omitted).

D.C.Code § 1–102 (2001). Alternatively, the government argues that even if § 22–1810 is limited to threats against property of natural persons, it still proscribes appellant's conduct because Officer Pena—a natural person—had a possessory interest in the police vehicle that appellant threatened to damage.

■ Appellant styles this issue as a sufficiency challenge by arguing that the evidence was insufficient to establish that appellant violated the felony threats statute. Yet, at bottom, the resolution of this claim "turn[s] on pure questions of law...." *Wynn v. United States,* 48 A.3d 181, 187–88 (D.C.2012) (reviewing *de novo* the reach of a statute prohibiting obstruction of justice). The government urges us to review appellant's claim for plain error because appellant acquiesced to a jury instruction that allowed the jury to find guilt based on evidence that he had threatened property belonging to the MPD. Here, however, as the issue before us is whether the felony threats statute criminalizes appellant's conduct, we would reach the same outcome under either plain error or *de novo* review because "[i]t would be both an obvious error and a miscarriage of justice for a defendant to stand convicted of an offense which the law does not make a crime." *Mitchell v. District of Columbia,* 741 A.2d 1049, 1052–53 (D.C.1999); *see also Moten v. United States,* No. 11–CM–1519, slip. op. at 2 n. 1 (D.C. July 3, 2013) ("[I]f we were to accept appellant's argument that he did not commit a crime because the 2009 statute did not prescribe a penalty for solicitation of prostitution, he would surmount the more stringent test applied in plain error

review."). Further, in interpreting the felony threats statute, we are conscious of the principle that "[c]riminal statutes are to be strictly construed and should not be interpreted to extend criminal liability beyond that which [the legislature] has plainly and unmistakenly proscribed." *United States v. Hilton,* 701 F.3d 959, 966 (4th Cir.2012) (citation and internal quotation marks omitted). For the following reasons, we conclude that the felony threats statute does not criminalize threats to destroy property owned by the District of Columbia and thus, we reverse appellant's felony threat conviction predicated on his threat to the police vehicle.[10]

## A. The meaning of "person" in the felony threats statute

Congress enacted the felony threats statute in Title X of the "Omnibus Crime Control and Safe Streets Act of 1968" (hereinafter the "1968 Crime Control Act") as 10 U.S.C. § 1502. *See* Pub.L. No. 90–351, 82 Stat. 197. Although the Council of the District of Columbia (hereinafter the "Council") has recodified this provision twice—as D.C.Code § 22–2307 (1973) and D.C.Code § 22–1810 (2001)—as of appellant's arrest, the Council had not altered the language adopted by Congress in the original statute.[11] Moreover, despite the recodifications, the Council still refers to the felony threats statute as "Section 1502 of the Omnibus Crime Control and Safe Streets Act of 1968." *See* Criminal Fine Proportionality Amendment Act of 2012, 2012 District of Columbia Law 19–317 § 223. For this reason, to discern the scope of "person," we first look to the

---

10. Appellant did not challenge his other felony threat conviction, which was predicated on his threat to injure Officer Amaya.

11. In 2012, the Council amended the penalty provision of the statute, "by striking the provision 'not more than $5,000' " and inserting the phrase "not more than the amount set

forth in section 101 of the Criminal Fine Proportionality Amendment Act of 2012, passed on 2nd reading on November 1, 2012 (Enrolled version of Bill 19–214)" in its place. Criminal Fine Proportionality Amendment Act of 2012, 2012 District of Columbia Law 19–317 § 223.

"Dictionary Act," 1 U.S.C. § 1 (1951), which governs "the meaning of any Act of Congress, *unless the context indicates otherwise.*" (emphasis added). As the felony threats statute is an Act of Congress, not the Council, we shall consider whether Congress intended the Dictionary Act to define the terms therein. *Cf. United States v. Bishton,* 264 A.2d 139, 140 (D.C. 1970) (considering whether the Dictionary Act governed the terms of a criminal statute and ultimately concluding that, in light of the purpose of the criminal statute, the Dictionary Act was inapplicable).

The Dictionary Act defines "person" as "includ[ing] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. The government argues that this broad definition of "person" encompasses the District of Columbia, given its legal status as a municipal corporation. *See* D.C.Code § 1–102. Consequently, we consider whether the context of § 1502—the original codification of the felony threats statute enacted by the 1968 Crime Control Act—indicates that Congress intended to limit the meaning of "person" to natural persons rather than "person" as defined by the Dictionary Act; and, even if Congress did intend to apply the Dictionary Act definition of "person" in § 1502, whether the District of Columbia should be considered a "corporation" as that term is defined by the Dictionary Act.

In *Rowland v. California Men's Colony Unit II Men's Advisory Council,* 506 U.S. 194, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993), the Supreme Court dissected the meaning of the qualification in the Dictionary Act that its definition of "person" applies "unless the context indicates otherwise." The Court determined that "[c]ontext here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts." *Id.* at 199, 113 S.Ct. 716. "If Congress had

meant to point further afield, as to legislative history, for example, it would have been natural to use a more spacious phrase, like 'evidence of congressional intent,' in place of 'context.'" *Id.* at 200, 113 S.Ct. 716. Accordingly, in considering the contextual meaning of "person" in § 1502, we consider the surrounding text in the 1968 Crime Control Act and other related Acts of Congress, but not the legislative history. In turn, the Court recognized:

> If 'context' thus has a narrow compass, the 'indication' contemplated by 1 U.S.C. § 1 has a broader one. The Dictionary Act's very reference to contextual 'indication' bespeaks something more than an express contrary definition ... the point at which the indication of particular meaning becomes insistent enough to excuse the poor fit is of course a matter of judgment, but one can say that 'indicates' certainly imposes less of a burden than, say, 'requires' or 'necessitates.'

*Id.* That is, "this exception from the general rule would be superfluous if the context 'indicates otherwise' only when use of the general definition would be incongruous enough to invoke the common mandate of statutory construction to avoid absurd results." *Id.* at 200, 113 S.Ct. 716. Simply put, the use of "unless the context indicates otherwise" excuses the court "from forcing a square peg into a round hole." *Id.* at 200–01, 113 S.Ct. 716.

In *Rowland,* the Court concluded that the use of "person" in a federal statute enabling qualified civil litigants to proceed *in forma pauperis* refers only to natural persons, not to artificial entities, due to four "contextual features" in the statute. *See id.* at 202–07, 113 S.Ct. 716. Specifically, the Court recognized that the *in forma pauperis* statute: (1) allows for persons to appear in court without counsel, while corporations may appear in federal courts only through licensed counsel; (2) requires an "allegation of poverty," which is a human condition; (3) requires appli-

cants seeking to proceed *in forma pauperis* to submit an affidavit regarding why they cannot afford court fees—yet, artificial entities cannot make affidavits; and (4) requires a court to find "an inability to pay" by considering the "necessities of life," whereas artificial entities do not have "necessities of life." *Id.* at 202–07, 113 S.Ct. 716. In its conclusion that the context of the *in forma pauperis* statute indicated that "person" was limited to natural persons, the Court recognized that in other cases where it had held that the Dictionary Act definition did apply, "the statutes in question manifested a purpose that would be substantially frustrated if we did not construe the statute to reach artificial entities." *Id.* at 209–11, 113 S.Ct. 716 (citing *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 666, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979) (applying Dictionary Act definition of person to prevent individuals who were otherwise subject to the statutory burden of proof from "escap[ing] its reach merely by incorporating and carrying on business as usual"), and *United States v. A & P Trucking Co.,* 358 U.S. 121, 124, 79 S.Ct. 203, 3 L.Ed.2d 165 (1958) (holding that although only the first of two criminal statutes governing truckers expressly applied to partnerships and the second statute applied to "whoever" knowingly violated a regulation, because the purpose of both statutes was to ensure truckers' compliance with safety requirements, it would defeat the purpose to limit the second statute to natural persons, which would enable truckers to violate the regulations "merely because of the form under which they operate" (footnote omitted))).

Here, in determining whether the contextual features indicate that Congress limited "person" in § 1502 to natural persons, we first look to the terms of the statute itself, which as noted above, prohibited threatening to "kidnap any person or to injure the person of another or physically damage the property of any person or of another person. . . ." This creates three means of committing a felony threat: (1) threatening to kidnap any person; (2) threatening to injure the person of another; or (3) threatening to damage the property of any person. Importantly, artificial entities, such as corporations, cannot be victims of the first two acts proscribed by § 1502 because they cannot be kidnapped or injured. *See United States v. Havelock,* 664 F.3d 1284, 1291 (9th Cir.2012) ("It simply makes no sense to threaten to kidnap a corporation, or injure 'the person' of a corporation. . . .").

▬▬▬ Limiting the victims of threats to kidnap and injure to natural persons, while including artificial entities amongst the victims of threats to inflict property damage, would run afoul of the " 'presumption that identical words used in different parts of the same act are intended to have the same meaning.' " *Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 595, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004) (quoting *Atl. Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932)). This presumption " 'is surely at its most vigorous when a term is repeated within a given sentence.' " [12] *Havelock, supra,* 664 F.3d at 1291 (quoting *Brown v. Gardner,* 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462

---

**12.** "The 'presumption of uniform usage' " does, however, "relent[ ] when a word used has several commonly understood meanings among which a speaker can alternate in the course of an ordinary conversation, without being confused or getting confusing." *General Dynamics, supra,* 540 U.S. at 595–96, 124 S.Ct. 1236. In *General Dynamics,* the Court

determined that Congress's use of "age" varied throughout different sections of the Age Discrimination Employment Act ("ADEA") because the particular contexts of each ADEA provision suggested a different meaning for "age." *Id.* at 596, 124 S.Ct. 1236. Unlike *General Dynamics,* where the Supreme Court

(1994) (brackets omitted)). Thus, in light of the "cardinal rule that statutory language must be read in context since a phrase gathers meaning from the words around it," and the lack of any indication from the text that Congress did not intend to use "person" uniformly, we decline to attribute different meanings to "person" in § 1502. *General Dynamics, supra,* 540 U.S. at 596, 124 S.Ct. 1236 (citation, internal quotation marks, and brackets omitted). Because the use of "injure" and "kidnap" restricts "person" to natural persons, and these proscriptions immediately precede "damage the property of any person," the presumption of uniformity requires that "person" is defined as "natural persons" throughout § 1502.

 In continuing our exploration of the context surrounding the use of "person" in § 1502, we also look to the language of § 1501, which was § 1502's companion statute (and for that matter, the only other provision) in Title X of the 1968 Crime Control Act.[13] Whereas § 1502 limited its scope to threatening to damage the "property of any *person* or of *another person,*" § 1501 criminalized the "intent to extort from any *person, firm, association, or corporation,* any money or other thing of value...." (emphasis add-

ed). Appellant observes that if Congress intended to use the term "person" as broadly defined by the Dictionary Act in § 1502, that would render the inclusion of "firm, association, or corporation" in § 1501 superfluous. We agree that such a reading would violate "one of the most basic interpretive canons that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States,* 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (citation, internal quotation marks, and ellipsis omitted). Specifically, "under ordinary principles of statutory construction, where Congress includes particular language in one section of a statute but omits it in another provision of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *United States v. Bly,* 510 F.3d 453, 461 n. 11 (4th Cir.2007) (citation and internal quotation marks omitted). Sitting en banc, the Ninth Circuit adopted this argument in *Havelock, supra,* 664 F.3d at 1292, in its interpretation of 18 U.S.C. § 875, the federal statute upon which Congress modeled §§ 1501 and 1502.[14] Considering §§ 875(c) and (d),

---

could look to different contexts to glean different meanings for the same word, we are faced here with the use "person" in a *single* sentence in which Congress prohibited threatening to kidnap a person, injure a person, or damage a person's property.

**13.** We distinguish our present contextual analysis of § 1501 from our decision in *Holt v. United States,* 565 A.2d 970, 975 (D.C.1989) (en banc), wherein appellant argued that the intent to extort requirement in § 1501 was implicit in § 1502 because the statutes were *in pari materia.* We held that:

The fact that [the felony threats statute] was enacted and codified in tandem with an extortion provision does not establish that the two statutes address the same subject matter.... We conclude that we need not

construe the two statutes together in order to divine the meaning of the felony threats statute, [§ 1502].

Here, unlike *Holt,* we are not examining § 1501 to find implicit elements of § 1502 beyond its plain text and we need not find the statutes *in pari materia.* Instead, in accordance with the approach adopted by the Supreme Court in *Rowland,* we look to § 1501 to glean context for § 1502.

**14.** *See Holt, supra* note 13, 565 A.2d at 973–74 (recognizing that the legislative history of §§ 1501 and 1502 indicated that the "bill was the result of a request and proposed legislation ... to bring D.C. law into conformance with a federal statute that prohibited communication of threats across state lines, 18 U.S.C. § 875 (1988 Supp.)").

which are similar to the language of §§ 1501 and 1502,[15] the Ninth Circuit concluded that § 875 "clearly envisions that 'person' is limited to a natural person and that the statute, by referring to 'firm, association, or corporation,' applies to both natural and non-natural persons." *Id.* Thus, the inclusion of· "person, firm, association, or corporation" in § 1501 indicates that the use of only "person" in § 1502 excluded non-natural persons.

The government notes that in 1982, the Council rewrote and severed the extortion statute (§ 1501) from the felony threats statute (§· 1502), moving the extortion statute to D.C.Code § 22–3251. The government argues that such changes "render[ ] reliance on the earlier, hastily enacted [extortion] language to interpret the threats statute an ill-advised venture." Instead, in the government's view, the revised Code indicates that the term "person" in the felony threats statute should be construed in accordance with the broad definition in both the Dictionary Act and Black's Law Dictionary.[16] We disagree. Our reading of the current codification of these statutes supports limiting "person" in the felony threats statute to natural persons. Section 22–3251 provides, in relevant part, that a person commits the offense of extortion if "that person obtains or attempts to obtain the *property of another* with the other's consent which was induced by

wrongful use of actual or threatened force or violence or by wrongful threat of economic injury." (emphasis added). Critically, the Council included a definitions subchapter that governs Chapter 32,[17] which defines "property of another" as:

> any property in which a government or a person other than the accused has an interest which the accused is not privileged to interfere with or infringe upon without consent, regardless of whether the accused also has an interest in that property. The term "property of another" includes the property of a corporation or other legal entity established pursuant to an interstate compact....

D.C.Code § 22–3201(4) (2001). Thus, the Council's use of "property of another" and its explicit inclusion of a "government" and a "corporation" in its definition thereof lie in contrast to Congress's use of "the property of any person or of another person" in the felony threats statute, the terms of which the Council left intact when it revised the criminal code in 1982. Conversely, the Council did not provide a definitions section for Chapter 18, which is entitled "General Offenses." Thus, neither the Council's changes to the extortion statute, nor its decision to codify the felony threats statute in the chapter governing "General Offenses," indicate that the Council intended to alter Congress's use of "person" in § 1502 of the 1968 Crime Control Act. If

---

**15.** 18 U.S.C. § 875(b) provides:

> Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of. another, shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 875(c) provides:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any

threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

**16.** BLACK'S LAW DICTIONARY 1257 (9th ed. 2009) defines "person" as:

> 1. A human being.
> 2. The living body of a human being.
> 3. An entity (such as a corporation) that is recognized by law as having most of the rights and duties of a human being.

**17.** Other crimes in Chapter 32 of the D.C.Code include: theft, shoplifting, fraud, forgery, and blackmail.

anything, the Council's actions support our interpretation that "person" is limited to natural persons for purposes of the felony threats statute.

Further, we are not persuaded by the government's assertion that, by virtue of its legal status as a municipal corporation, the District of Columbia is a "corporation" within the purview of the Dictionary Act for purposes of the felony threat statute. Consideration of the overarching statutory scheme of the 1968 Crime Control Act indicates that Congress did not intend to include the District of Columbia in it use of "person" in the felony threats statute. Although the District of Columbia has been constituted "as a body corporate for municipal purposes" with all the "powers of a municipal corporation" since 1878, 20 Stat. 102, ch. 180, § 1 (1878), "[f]or relevant purposes, [the District of Columbia] has been variously compared to or described as a state, territory, or municipality, and sometimes it has simply been called 'unique.'" *District of Columbia v. Owens–Corning Fiberglas Corp.,* 572 A.2d 394, 400 (D.C.1989) (citing, *inter alia, Palmore v. United States,* 411 U.S. 389, 395–96, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) (The "District is a state for diversity purposes and its courts are treated as state courts, but its laws are not state laws."), and *Firemen's Ins. Co. of Washington, D.C. v. Washington,* 157 U.S.App.D.C. 320, 325, 483 F.2d 1323, 1328 (1973) ("The District is a unique entity, more akin to a state than to a municipality.")). Here, in other titles, the 1968 Crime Control Act twice defined "State" as including "any State of the United States [and] the District of Columbia." Pub.L. 90–351, Chapter 199 § 2510, Chapter 44 § 921. Accordingly, it does not necessarily follow that, in this context, the District of Columbia is a "corporation" within the purview of the Dictionary Act.

Our interpretation is bolstered by appellant's observation that, if we conclude that property owned by the District of Colum-bia is protected by the felony threats statute by virtue of the District of Columbia's status as a municipal corporation, it would be a felony to threaten to break the window of a MPD vehicle, but a similar threat to break the window of a Secret Service or Park Police vehicle would be exempt from the statute. This incongruous result would occur because the Dictionary Act definition of "person" includes "corporations," but not "governments" or "sovereigns." Thus, adopting the government's position would defy the canons of statutory interpretation that "the literal meaning of a statute will not be followed when it produces absurd results," and "whenever possible, the words of a statute are to be construed to avoid obvious injustice." *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 754 (D.C.1983) (en banc) (citations and internal quotation marks omitted). Here, interpreting the felony threats statute in a manner that would render the criminality of appellant's threat to kick out the windows of a police vehicle contingent upon whether the vehicle was owned by the District of Columbia or the United States would lead to both an obvious injustice and an absurd result.

 In conclusion, the four contextual features discussed above indicate that the word "person," as first used in 10 U.S.C. § 1502, and later recodified in D.C.Code § 22–1810, does not encompass the sweeping definition in the Dictionary Act. First, in light of the impossibility of extending the statute's proscriptions of threats to kidnap and injure to artificial persons, the presumption of uniform usage requires that "person" be limited to natural persons. Second, including artificial entities in "person" in § 1502 would render the list of artificial entities in § 1501 superfluous. These two features establish that "person" is limited to natural persons. Third, even if we were to accept that "per-

son" encompasses artificial entities, the reference to the District of Columbia as a state elsewhere in the 1968 Crime Control Act belies the possibility that Congress intended to include District of Columbia-owned property within the statute's purview. Finally, as a corollary to the third contextual feature, we must construe the statute to avoid the absurd and unjust result of criminalizing threats against District of Columbia-owned police vehicles but not federally-owned police vehicles. Therefore, the context indicates that the Dictionary Act definition does not apply to "person" in the felony threats statute. To the contrary, the contextual features suggest that "person" is limited to natural persons, and, in any event, that it excludes property owned by the District of Columbia. Consequently, "the rule of lenity requires that, when a choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Hilton, supra,* 701 F.3d at 968. (citations, internal quotation marks, and brackets omitted).

## B. Property interests protected by the felony threats statute

Alternatively, the government argues that even if we construe the felony threats statute to apply only to threats made to the property of natural persons, appellant's conviction is still lawful because "the statute does not describe what type of property interest a person must have in the threatened property for the threat to be cognizable." Specifically, appellant threatened to kick a police vehicle assigned to Officer Pena, who, pursuant to MPD procedures, was responsible for the vehicle's care and operation.[18] MPD Gen-

eral Order 301, Part 1, A.2 (rev'd Nov. 3, 1986). Given his responsibilities concerning the vehicle assigned to him, the government contends that Officer Pena had a possessory interest in that vehicle and that appellant's threat to damage the police vehicle impinged upon Officer Pena's property interest.

■ This sweeping interpretation does not comport with our case law. In support of this argument, the government cites to *Moss v. United States,* 368 A.2d 1131, 1134 (D.C.1977), for the proposition that both ownership and possession are property rights recognized by law. Yet in *Moss,* we interpreted a larceny statute that criminalized "whoever shall feloniously take and carry away any property of value less than $100...." D.C.Code § 22–2202 (1973); *see Moss, supra,* 368 A.2d at 1132. We determined that the phrase "any property of value" did not require the property to be owned by anyone in particular because "[t]he common law definition of larceny recognized it as a crime against possession, rather than against legal ownership of property." *Moss, supra,* 368 A.2d at 1133. In comparison, the felony threats statute, which proscribes "damag[ing] the property of any person or of another person," is much closer to the language of the shoplifting statute that we addressed in *Carmon v. United States,* 498 A.2d 580 (D.C.1985). There, we determined that the use of the phrase "personal property of another" in the shoplifting statute, D.C.Code § 23–3813 (1985 Supp.), required the government to prove that someone other than the defendant *owned* the goods. *Id.* at 582. Moreover, we explained that the use of "the personal property of another" distinguished the shoplifting statute from former larceny statutes, which encompassed crimes against posses-

---

18. "Care and operation" explicitly include "[t]he safeguarding of the vehicle as well as its assigned equipment." MPD General Order 301, Part 1, A.2 (e) (rev'd Nov. 3, 1986).

sion. *Id.* at 582 n. 3. We therefore conclude that ownership—not a property interest—is an element of the felony threats statute. The felony threats statute does not protect victims with interests in, but not ownership of, the threatened property.

 In summary, we have established, first, that the context of the felony threats statute indicates that its use of "person" is limited to natural persons, thereby excluding threats to property owned by artificial entities—particularly the District of Columbia; and, second, that the statute does not criminalize threats that impinge upon possessory property interests. Our conclusion is supported by the Supreme Court's admonition, which the Ninth Circuit recently recited in its factually-analogous *Havelock* decision, that " '[b]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.' " 664 F.3d at 1292 (quoting *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). We therefore hold that appellant did not violate the felony threats statute by threatening to break the windows of a police vehicle owned by the District of Columbia.

## IV. Conclusion

For the foregoing reasons, we reverse appellant's APO conviction and felony threat conviction that was based on his threat to damage the police vehicle. Further, we remand to the trial court to vacate appellant's sentence for committing a

burglary while on release—a crime for which he was not convicted.[19]

*So ordered.*

 ---

**19.** It appears from the sentencing transcript that, when the trial judge imposed a consecutive 12–month sentence for committing an offense during release pursuant to Count 5 of the indictment, he was unaware that the Count 5 specified that the predicate crime for the charge of committing an offense during release charge was burglary, rather than appellant's felony threats against Officer Pena and the MPD vehicle. The sentencing order specified that appellant was sentenced pursuant to Count 5. In its brief, the government states that it "agrees with appellant the trial court imposed an illegal sentence on Count 5 of the indictment."